(Nos. 89075, 89084 cons.—

PRIMECO PERSONAL COMMUNICATIONS, L.P., *et al.*, Appellees and Cross-Appellants, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Appellants and Cross-Appellees.

*Opinion filed March 29, 2001.—Rehearing denied June 4, 2001.*

FREEMAN, J., joined by McMORROW, J., dissenting upon denial of rehearing.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and A. Benjamin Goldgar, Assistant Attorney General, of Chicago, of counsel), for appellant Illinois Commerce Commission.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon and Julian N. Henriques, Jr., of counsel), for appellant City of Chicago.

Caesar A. Tabet and Karina H. DeHayes, of Tabet, DiVito & Rothstein, LLC, and William R. Quinlan and Jean M. Prendergast, of Quinlan & Crisham, Ltd., all of Chicago, for appellees Primeco Personal Communications, L.P., *et al.*

Marvin A. Miller, of Miller, Faucher & Cafferty LLP, Lawrence W. Schad and Stephen B. Diamond, of Beeler, Schad & Diamond, P.C., Myron Cherry and Matthew D. Tanner, of Cherry & Lehman, LLC, Robert A. Holstein and Thomas A. Zimmerman, Jr., of Stern, Holstein, Zimmerman & Hanson, P.C., Lee J. Schwartz, Kevin M. Forde and Edward R. Vrdolyak, all of Chicago, for intervenor appellees Dr. William Spillman *et al.*

Roger Huebner, of Springfield, for *amicus curiae* Illinois Municipal League.

JUSTICE THOMAS delivered the opinion of the court:

In this case, we are asked to decide whether the "municipal infrastructure maintenance fee" (the municipal IMF) (see 35 ILCS 635/20 (West 1998)), part of the Telecommunications Municipal Infrastructure Maintenance Fee Act (35 ILCS 635/1 *et seq.* (West 1998)), violates the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, § 2). The municipal IMF is a fee which municipalities are allowed to impose on telecommunications retailers as a percentage of the retailers' gross charges to their customers. The plaintiffs in this case are all wireless telecommunications retailers. They brought this action to declare the municipal IMF unconstitutional and to enjoin the state from enforcing its provisions. The plaintiffs argued that the municipal IMF was intended as a means of compensating municipalities for the physical occupation of the public rights-of-way by certain telecommunications providers. Since the plaintiffs are not among those telecommunications providers who physically occupy the public rights-of-way with their infrastructure, they argued that it was unreasonable and therefore unconstitutional to include them within the class of telecommunications retailers subject to the municipal IMF. The intervening plaintiffs are all consumers who have paid the municipal IMF, who agree with the plaintiffs' assertion that the municipal IMF is unconstitutional, and who are seeking reimbursement in the circuit court.

The defendant is the Illinois Commerce Commission (ICC), the state agency with the responsibility of regulating certain aspects of the telecommunications industry in Illinois. The intervening defendant is the City of Chicago, one of the municipalities that has passed an ordinance imposing a municipal IMF. The defendant and the intervening defendant (the defendants) argued that the

municipal IMF was merely a means of raising municipal revenue and that the General Assembly did not overstep its constitutional bounds in extending the municipal IMF to wireless providers.

The trial court agreed with the plaintiffs that the municipal IMF was unconstitutional and struck it down on its face. Because the circuit court invalidated an Illinois statute, the defendants took their appeal directly to this court. See 134 Ill. 2d R. 302(a)(1). While we agree that the municipal IMF is unconstitutional as applied to the plaintiffs in this case, we do not find it to be invalid on its face. A recitation of the pertinent facts in this case is necessary in order to frame the legal issue presented to us.

## BACKGROUND

For decades, the public rights-of-way have been available for use by the telecommunications industry. Historically, landline providers (*i.e.*, telecommunications providers who transmit messages by means of cable wire) have built, owned, and maintained a wire-based (or fiber-optic-cable-based) infrastructure by placing telecommunications cables, poles, switching equipment, terminal boxes, manhole covers, concentrators, splicing cases, and other equipment in and under the public streets and roadways. The landline providers use this infrastructure to transmit telephone calls or other data for their customers. However, the landline system is no longer the only means of sending and receiving telecommunications. For many years, it has been possible to send and receive telecommunications without the use of wires or cables—in other words, by wireless means. In order to facilitate the transmission of wireless telecommunications, however, an alternate infrastructure had to be established.

Wireless telecommunications providers transmit messages through the air by means of microwave transmissions rather than cable wire. The wireless infrastructure

consists of base stations and radio cell towers located at various locations within the wireless provider's service area. These individual base stations and cell towers send and receive microwave transmissions within a "cell" site. That is, they send and receive electromagnetic signals to or from cellular devices which are passing within a certain radius of the base station or cell tower (usually two or three miles, but sometimes as little as one-quarter of a mile). A wireless provider's service area is composed of a mosaic of cells that are positioned in such a manner as to reach any customer located within the service area. When an electromagnetic signal is received at one of these stations or towers, it is then transmitted to the wireless provider's switching station, which directs the signal to its ultimate destination.

At the present time, it is impossible for the wireless providers to rely entirely on their own wireless infrastructure to send and receive most telecommunications. For instance, if a cellular customer wishes to call a land-based telephone, the signal must pass through the landline system (at least for the last portion of the call) in order for it to reach the landline customer. Conversely, when a landline customer wishes to call a wireless customer, the landline provider must use the wireless provider's infrastructure to complete the call. In order to facilitate the completion of such calls, the wireless and landline providers have negotiated "interconnection agreements" by which they pay each other specified amounts based on a standard charge for each minute that a landline provider uses the wireless infrastructure and vice versa.

Wireless and landline usage intersect in other situations as well. For instance, when a cellular customer wishes to call another cellular customer (even if both customers use the same wireless provider), the wireless customer places the call, which is then received at a cell

tower servicing the cell site in which he is located. Once the signal is received, it must be sent to a switching center. In order for the signal to be sent from the cell site to the switching center, it must pass through the landline system. After it is received at the switching center, it is sent through the landline system again to the cell site where the other cellular customer is located. Once the signal reaches the cell site, it is transmitted electromagnetically to the other wireless customer's cellular device.

In order for a wireless provider to obtain the right to transmit its electromagnetic signals through the landline system, it must lease the capacity from a landline provider. When a wireless provider enters into lease agreements with the landline provider for the purpose of allowing it to send messages between its cell sites and switching center, it is called "backhaul services."

In order to provide telecommunications services to all of their customers, the landline providers install and maintain an extensive system of wires and cables within the public rights-of-way. Wireless providers, on the other hand, do not own, operate or maintain any equipment in the public rights-of-way. The wireless providers operate and maintain all of their equipment on private property pursuant to privately negotiated commercial leases.

Historically, landline providers have obtained access to the public rights-of-way by negotiating with individual municipalities. In order to establish and maintain telephone service, a landline provider would often have to tear up the public roads, dig holes, and erect telephone poles along the streets. Until 1998, the landline providers obtained the right to do this in exchange for the payment of what was called a "franchise fee." The franchise fee operated as a means of compensating the municipality for the providers' use of the streets, sidewalks and other public areas. See *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.*, 279 Ill. 324, 325-26 (1917).

Of course, wireless providers never entered into municipal franchise fee agreements. Because the wireless providers have never installed any equipment in the public rights-of-way, they would never have any need to negotiate with municipalities for the right to do so. However, under the franchise fee system, when a landline provider leased capacity to wireless providers, it would pass a share of the franchise fee on to the wireless providers in proportion to the volume of capacity used by them. These costs were embedded within the lease payments made to the landline provider.

Franchise fees were not the only fees or taxes paid by telecommunications retailers to the various organs of government. Until 1998, the state levied a tax on telecommunications retailers called the "invested capital tax." See 35 ILCS 610/2a.1 (West 1996). The invested capital tax was paid to the state, not municipalities, in an amount equal to 0.8% of the telecommunication retailer's invested capital for the taxable period. 35 ILCS 610/2a.1 (West 1996).

Five years ago, Congress amended the Communications Act of 1934 in the form of the federal Telecommunications Act of 1996. One of these amendments provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a) (Supp. 1996). It goes on to say that "[n]othing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis ***." 47 U.S.C. § 253(c) (Supp. 1996).

Following the passage of the amendments to the

Telecommunications Act, the Illinois General Assembly passed the Telecommunications Municipal Infrastructure Maintenance Fee Act (the Act), which became effective on January 1, 1998. 35 ILCS 635/1 *et seq.* (West 1998). The Act repealed the invested capital tax (35 ILCS 635/905 (West 1998)), and abolished franchise fees (35 ILCS 635/30(a) (West 1998)). In their place, the General Assembly enacted three new taxes: the state infrastructure maintenance fee (state IMF) (35 ILCS 635/15(a), (b) (West 1998)), the optional infrastructure maintenance fee (optional IMF) (35 ILCS 635/15(c), (d) (West 1998)), and the municipal IMF (35 ILCS 635/20 (West 1998)). The state IMF is paid to the state in an amount equal to 0.5% of a telecommunication retailer's "gross charges" to its customers. 35 ILCS 635/15(b) (West 1998). The optional IMF is also paid to the state, but only in the event that a certain municipality has not yet adopted a municipal IMF and there is no preexisting franchise fee agreement between the retailer and the municipality. 35 ILCS 635/15(c), 30 (West 1998). Payment of the optional IMF gives the retailer the right to "use" the public rights-of-way in the municipality to which the fee relates without having to negotiate the payment of a franchise fee. 35 ILCS 635/30 (West 1998).

The municipal IMF is a fee paid to a certain municipality that has passed an ordinance imposing one. 35 ILCS 635/20(a) (West 1998). The maximum amount that a municipality can charge in the form of a municipal IMF is dependent upon the size of the municipality. 35 ILCS 635/20(b) (West 1998). If the municipality has a population greater than 500,000 (*i.e.*, Chicago), it may charge a municipal IMF no greater than 2% of the "gross charges charged by the telecommunications retailer to service addresses in the municipality for telecommunications originating or received in the municipality." 35 ILCS 635/20(b)(i) (West 1998). For all other municipali-

ties in Illinois, the maximum amount is 1%. 35 ILCS 635/20(b)(ii) (West 1998). The General Assembly determined that the municipal IMF:

> "shall be the only fee or compensation for recovering the reasonable costs of regulating the use of the public rights-of-way and for the use of public rights-of-way that may be levied by or otherwise required by ordinance, resolution, or contract to be paid to a municipality for the use of its public way by telecommunications retailers." 35 ILCS 635/30 (West 1998).

See also 35 ILCS 635/35 (West 1998).

Soon after the passage of the Act, the City of Chicago passed its own municipal IMF at the maximum allowable rate, 2%. See Chicago Municipal Code § 3—75—030(A) (eff. January 1, 1998). The ordinance, like the Act itself, provided that the municipal IMF would be imposed on "all gross charges charged by telecommunications retailers to a service address in the city for telecommunications originating or received in the city." Compare Chicago Municipal Code § 3—75—030(A) (eff. January 1, 1998) with 35 ILCS 635/20(b)(i) (West 1998).

On April 27, 1998, a number of wireless providers filed this action for injunctive and declaratory relief challenging the constitutionality of the Act insofar as it authorizes municipalities to impose a municipal IMF. The plaintiffs, Primeco Personal Communications, L.P., Illinois RSA #3, Inc., USCOC of Illinois RSA #4, Inc., Davenport Cellular Telephone Co., USCOC of Illinois RSA #1, Inc., and National Cellular Communications, Inc., are all wireless telecommunications retailers providing wireless telephone service to customers in Illinois. The defendant, the ICC, is the Illinois agency responsible for regulating the rates of landline telecommunications providers. The complaint contained three counts, all seeking to invalidate the municipal IMF as unconstitutional on its face. After the complaint was filed, the City of Chicago intervened as a defendant to defend the

constitutionality of the Act as well as the City's own municipal IMF ordinance.

In count I, the plaintiffs argued that the municipal IMF violates the uniformity clause because it allows municipalities to assess a percentage fee on the "gross charges" of telecommunications retailers, whether landline or wireless. Because the purpose of the municipal IMF is to compensate municipalities for the use of the public rights-of-way, it was argued, the extension of the municipal IMF to wireless providers, who do not own or operate any equipment in the public rights-of-way, was "entirely unreasonable and inconsistent with the express purpose of the [IMF] Act." According to the complaint, the Act, by classifying all telecommunications providers as equally subject to the municipal IMF, violated the portion of the uniformity clause which requires the General Assembly to classify the subjects or objects of nonproperty taxes in a reasonable manner.

In count II of the complaint, the plaintiffs argued that the municipal IMF violated the uniformity clause because of those entities which the Act excluded from its coverage. Precisely, the plaintiffs argued that certain entities that use "PBX" (private branch exchange) and "Centrex" systems are not subject to payment of a municipal IMF, but should be. Centrex customers are those entities which lease switching capacity from landline providers for private use. These entities tend to be large corporations or commercial landlords that need an internal means of communication, but do not wish to establish their own network of wires and equipment. Instead, the Centrex customers sign a lease with a landline provider for the limited use of some of the landline provider's infrastructure. PBX customers, on the other hand, buy or lease a switching computer which performs the same function as a Centrex system. Instead of signing a lease with a landline provider, the PBX customer

buys or leases its own switching computer which is located on the customer's premises. When a PBX or Centrex system has been established, it allows its users to dial an extension which then routes the call to another user within the system. If the user wishes to make a call to someone outside of the system, the user must dial "9" in order to access an outside line.

According to the plaintiffs, the exclusion of PBX and Centrex customers from coverage under the municipal IMF creates an unreasonable classification. Because the PBX or Centrex customers simply lease capacity from the landline providers, the wireless plaintiffs argued that their own use (or, rather, nonuse) of the public rights-of-way is equivalent to that of PBX and Centrex customers. For this reason, it was argued that there is no justification for making wireless providers subject to the municipal IMF while excluding PBX and Centrex entities.

Finally, in count III, the plaintiffs argued that section 13—511 of the Public Utilities Act, which became effective on the same date as the municipal IMF, is unconstitutionally vague because it contains language that is so imprecise that it fails to offer meaningful guidance to the ICC as the agency charged with enforcing the directives contained in the statute. See 220 ILCS 5/13—511 (West 1998). Section 13—511 of the Public Utilities Act provides the following:

> "With respect to any telecommunications retailer that is regulated by the Illinois Commerce Commission, the Commision shall order such rate adjustments as shall be necessary to assure that the implementation of the Telecommunications Municipal Infrastructure Fee Act *** shall have no significant impact on the net income of each such telecommunications retailer." 220 ILCS 5/13—511 (West 1998).

The plaintiffs argued that when the statute authorizes the ICC to adjust the rates of landline providers to assure that the Act "shall have no significant impact on

the net income of each *** telecommunications retailer," the language used by the General Assembly is so vague and ambiguous that it fails to provide reasonable standards for restricting the ICC's discretion.

The parties filed cross-motions for summary judgment on all three counts. In their cross-motions, the parties agreed that there were no disputed issues of material fact and that summary judgment was therefore appropriate. On January 11, 2000, the circuit court granted the plaintiffs' motion for summary judgment on count I, but entered summary judgment in favor of the defendants on counts II and III. The circuit court found that the Act created an unreasonable class of subject entities by broadly imposing the municipal IMF on all telecommunications retailers, both landline and wireless, whether they used the public rights-of-way or not. Because the circuit court found that the object of the municipal IMF was to compensate municipalities for the use of the public rights-of-way, the court then determined that it was unreasonable to include wireless providers, who never "use" the public rights-of-way, within the class of individuals subject to the municipal IMF.

The parties filed cross-appeals, which we consolidated. Because the circuit court invalidated an Illinois statute, the appeals were taken directly to this court. See 134 Ill. 2d R. 302(a)(1). The circuit court stayed the enforcement of its judgment pending appeal, subject to certain conditions. After the notices of appeal had been filed, Dr. William Spillman, Tiffany Insurance Agency, and 13 other persons were given leave to intervene as plaintiffs in the circuit court and as cross-appellees in this court. The intervening cross-appellees are all consumers who have paid the municipal IMF and are now seeking restitution in the circuit court.

Although there are cross-appeals filed in this case, the plaintiffs' cross-appeal relates only to counts II and

III. It is the defendants' appeal that asks us to reverse the circuit court's judgment on count I. Because we partially affirm the circuit court's judgment on count I and invalidate the municipal IMF as it applies to the plaintiffs in this case, we do not address the plaintiffs' cross-appeal on counts II and III.[1]

## ANALYSIS

The defendants' appeal is taken from an order entering summary judgment in the plaintiffs' favor on count I. Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 1998). The parties in this case agree that there were no contested issues of material fact to be resolved by a fact finder. Therefore, summary judgment in this case was unquestionably appropriate. The only issue we need to resolve is a legal one: does the municipal IMF, as imposed on a class of telecommunications providers regardless of their use of the public rights-of-way, create a reasonable class of subject entities under article IX, section 2, of the Illinois Constitution? Our review of the circuit court's resolution of this legal question is *de novo*. *McNamee v. State*, 173 Ill. 2d 433, 438 (1996).

### I. The Uniformity Clause

Article IX, section 2, of the Illinois Constitution states the following:

"In any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable." Ill. Const. 1970, art. IX, § 2.

---

[1]We intimate no view on the validity of the municipal IMF as it relates to those not similarly situated to the plaintiffs.

A fair reading of the text of this provision shows that there are two separate requirements contained in the first sentence. The first requires the General Assembly to classify the subjects or objects of nonproperty taxes reasonably. Once a reasonable classification has been established, the second requirement is that the members of that class must be taxed uniformly. In this case, we are only concerned with the first requirement, which we will refer to as the "reasonable classification" requirement.

In order for a classification to be considered reasonable, it must be (1) based on a real and substantial difference between those who are taxed and those who are not taxed, and it must (2) bear some reasonable relationship to the object of the legislation or to public policy. *Milwaukee Safeguard Insurance Co. v. Selcke*, 179 Ill. 2d 94, 98 (1997); *Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 250 (1996); *Searle Pharmaceuticals, Inc. v. Department of Revenue*, 117 Ill. 2d 454, 468 (1987). The foregoing test has also been applied in cases construing article IX, section 1, of the 1870 Constitution. See *Searle Pharmaceuticals, Inc.*, 117 Ill. 2d at 468-69; Ill. Const. 1870, art. IX, § 1. For purpose of this appeal, however, we are only concerned with the second prong of the "reasonable classification" test, namely, whether the classification of entities subjected to taxation under the municipal IMF bears some reasonable relationship to the object of the municipal IMF itself or to public policy.[2]

The initial burden of proof in these cases is not with the party attacking the classification as unreasonable.

---

[2]The first prong of the "reasonable classification" test compares and contrasts the class of taxed entities with those that are not taxed. The allegation in count I, on the other hand, is focused exclusively on the similarities or differences within the class of entities subject to taxation.

*Milwaukee Safeguard Insurance Co.*, 179 Ill. 2d at 98. Rather, when a good-faith challenge to the reasonableness of a tax classification has been presented, it is the taxing body that must first justify the tax classification. *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 248 (1992). Once the taxing body comes forward with a justification, the challenging party must persuade the court that the taxing body's justification is unsupported by the facts or insufficient as a matter of law. *Geja's Cafe*, 153 Ill. 2d at 248-49. With that in mind, we address the parties' contentions.

## II. The Object of the Municipal IMF

A uniformity clause challenge such as this one requires us to first determine the *object* (or purpose) of the taxing provision at issue. *Milwaukee Safeguard Insurance Co.*, 179 Ill. 2d at 98. Once we have determined the object, it is incumbent upon us to determine whether that object is reasonably related to the class of entities taxed. *Milwaukee Safeguard Insurance Co.*, 179 Ill. 2d at 98. The plaintiffs argue that the purpose behind the municipal IMF was to replace the franchise fee system. According to their theory, instead of having a complex array of franchise fees charged on a municipality-by-municipality basis, the municipal IMF would establish a uniform charge that telecommunications providers would pay to have access to the public rights-of-way. Because the wireless providers do not own or operate any equipment in the public rights-of-way or have any desire or need to do so, they argue that it is unreasonable to place them in a class of entities who must pay the municipal IMF. Rather, it is the landline providers who alone make use of the public rights-of-way for telecommunications activity.

Defendants, on the other hand, argue that the purpose of the municipal IMF is to provide a means of raising municipal revenue and that nothing in the Act

purports to limit the purpose of the municipal IMF to that of a "user fee." The defendants' argument rests on a dichotomy drawn between user fees and taxes. According to the defendants, a user fee is strictly limited to cost-recovery for a specific purpose while a tax, on the other hand, may be imposed simply to raise revenue for any number of reasons. They argue that the text and structure of the Act indicate an intent to create a municipal tax on telecommunications activity generally, not a user fee. Building on this assertion, they argue that the classification created by the municipal IMF, which includes both wireless and landline telecommunications providers, is reasonably related to the purpose of the municipal IMF, which was simply to raise municipal revenue without regard to a telecommunication provider's use or nonuse of the public rights-of-way.

Unlike many other taxing schemes, the Act is not at all cryptic as to the purpose behind the municipal IMF. In fact, the first section in the Act, after the short title, is entitled "Legislative intent." See 35 ILCS 635/5 (West 1998). In pertinent part, it states the following:

> "This Act is intended to abolish the invested capital tax on telecommunications retailers ***[,] abolish municipal franchise fees with respect to telecommunications retailers, create a uniform system for the collection and distribution of fees associated with the privilege of use of the public right of way for telecommunications activity, and provide municipalities with a comprehensive method of compensation for telecommunications activity including the recovery of reasonable costs of regulating the use of the public rights-of-way for telecommunications activity." 35 ILCS 635/5 (West 1998).

The defendants argue that we should disregard this section because it consists of nothing more than "prefatory language." According to the defendants' theory, courts should only look to these types of sections, sometimes referred to as preambles, when the operative parts of the act are ambiguous. Because the operative parts of the

Act are not ambiguous, it is argued, we need not look to the Act's legislative intent section to discern its purpose.

Defendants misunderstand our precedents on this matter. While it is true that a "declaration of policy or a preamble is not a part of the act itself" (*Triple A Services, Inc. v. Rice*, 131 Ill. 2d 217, 227 (1989); see also *Brown v. Kirk*, 64 Ill. 2d 144, 152-53 (1976)), that is not the end of the matter. In *Atkins v. Deere & Co.*, we held that a "preamble has long been recognized as one of the quintessential sources of legislative intent." *Atkins v. Deere & Co.*, 177 Ill. 2d 222, 232 (1997). "The fact that the preamble often accompanies a bill throughout the legislative process, is voted upon by the members of the General Assembly, and is included in the text which is presented to the Governor for signature highlights the unique character of the preamble in terms of legislative intent." *Atkins*, 177 Ill. 2d at 232; accord *Edwards v. Pope*, 4 Ill. 465, 470 (1842) (holding that the "preamble to a statute is no part of the act; still it may assist in ascertaining the true intent and meaning of the legislature"). Moreover, "a preamble constitutes a stronger expression of intent than does a passing comment made by a single legislator during legislative debates." *Atkins*, 177 Ill. 2d at 232-33.

Defendants urge us, instead of relying on section 5 to discern the object of the municipal IMF, to look to sections 20 and 25(a) and (c) of the Act (35 ILCS 635/20, 25(a), (c) (West 1998)), which, they argue, establish that the municipal IMF is not intended as a tool for compensating municipalities for the use of the public rights-of-way, but simply as a means of raising municipal revenue. Sections 20 and 25, however, are certainly not the only sections in the Act that discuss the municipal IMF. A fundamental principle of statutory interpretation is that we must give effect to the entire statutory scheme rather than looking at words and phrases in isolation from other

relevant portions of the statute. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 504 (2000). In other words, statutes should be construed as a whole, with each provision evaluated in connection with every other section. *Lulay v. Lulay*, 193 Ill. 2d 455, 466 (2000).

Section 5 of the Act strongly implies that the municipal IMF was intended as a replacement for the revenue generated by franchise fees. According to this section, the Act was intended to "abolish municipal franchise fees with respect to telecommunications retailers, [and] create a uniform system for the collection and distribution of fees associated with the privilege of use of the public right of way for telecommunications activity." 35 ILCS 635/5 (West 1998). The defendants argue, however, that this language does not necessarily imply that the purpose of the municipal IMF was to compensate municipalities for the use of the public rights-of-way. Because the municipal IMF is not in direct proportion to the costs incurred by municipalities in allowing telecommunications providers to have access to the public rights-of-way, the defendants argue that the municipal IMF was obviously not intended solely as a means of compensation, but also as a means of raising revenue in excess of a municipality's actual costs involved in allowing such access. However, the same could be said of franchise fees, the sole purpose of which was to compensate municipalities for the privilege of accessing the public rights-of-way.

The franchise fee was often treated as a sort of rent payment "which the [telecommunications provider] was required to pay as a reasonable compensation for the use of the parts of the streets and alleys occupied by its poles" or other equipment. *City of Springfield*, 279 Ill. at 327. Normally, a municipality would pass an ordinance in which it would offer a telecommunications provider the right of access to the public rights-of-way in return for a

certain sum of money or other consideration. *City of Springfield*, 279 Ill. at 327. In other words, the franchise fee was contractual in nature. *City of Springfield*, 279 Ill. at 327-29; *Village of West City v. Illinois Commercial Telephone Co.*, 372 Ill. 493, 495-97 (1939).

Historically, municipalities would often bargain with telecommunications providers in order to extract the maximum amount of consideration that a provider would be willing to pay for using the public rights-of-way. In the years leading up to the passage of the Act, however, we began to reign in the power of municipalities in this respect. In 1993, we held that a municipality's only interest in the public streets was regulatory in nature, not proprietary. *American Telephone & Telegraph Co. v. Village of Arlington Heights*, 156 Ill. 2d 399, 413 (1993). As such, franchise fees could "only cover actual costs, including inspection, regulatory, administrative and repair costs associated with the tunneling under public streets." *American Telephone & Telegraph Co.*, 156 Ill. 2d at 413-14. Municipalities, we held, did "not have the authority to hold the public streets hostage as a means of raising revenue." *American Telephone & Telegraph Co.*, 156 Ill. 2d at 408.

Obviously, our holding in *American Telephone & Telegraph Co.* could only reach as far as those cases in which a telecommunications provider actually challenged the imposition of a franchise fee in court. It would therefore be reasonable to assume that there were still a number of franchise agreements in existence at the time the Act was passed that imposed fees which were wholly unrelated to a municipality's regulatory costs. But regardless of whether the franchise fee was proportional to a municipality's regulatory costs, its purpose was always the same—as a *quid pro quo* for granting telecommunications providers access to the public rights-of-way.

Prior to the enactment of the Act, a telecommunica-

tions provider never would have entered into a franchise fee agreement with a municipality unless it needed to access the public rights-of-way in that particular municipality. Once a telecommunications provider gained access to the public rights-of-way by paying a franchise fee, it would use that access to lay cable or erect telephone poles or other equipment on public property. If the municipal IMF was intended as a statewide replacement for franchise fees, it makes sense to conclude that this same bargain has now been codified in the form of the municipal IMF.

For this reason, it makes no difference whether the municipal IMF raises revenue in direct proportion to a municipality's regulatory costs. In cases brought under the second prong of the "reasonable classification" test, we are merely asking whether the tax classification created by a piece of legislation is reasonably related to its object (see *Milwaukee Safeguard Insurance Co.*, 179 Ill. 2d at 98), not whether the means of taxation are crafted in a way to raise revenue in direct proportion to the costs related to the object of the legislation.

In addition to abolishing and replacing franchise fees, the municipal IMF was also intended to "create a uniform system for the collection and distribution of fees associated with the privilege of use of the public right of way for telecommunications activity." 35 ILCS 635/5 (West 1998). The defendants argue that this clause proves their point concerning the revenue-raising purpose of the municipal IMF. Because the municipal IMF is a fee which is merely "associated with" the use of the public rights-of-way, it is argued, this means that the fee is intended to compensate municipalities for more than just their regulatory costs. However, as we just discussed, franchise fees themselves were not necessarily directly proportional to a municipality's regulatory costs. What is important is that the franchise fees were paid to a municipality in

exchange for the privilege of accessing the public rights-of-way. Whether the fees were directly proportional to a municipality's regulatory costs is irrelevant in discerning their ultimate purpose.

The remaining language in section 5 states that the municipal IMF was intended as a means of providing "municipalities with a comprehensive method of compensation for telecommunications activity *including* the recovery of reasonable costs of regulating the use of the public rights-of-way for telecommunications activity." (Emphasis added.) 35 ILCS 635/5 (West 1998). The defendants argue that the legislature's use of the term "including" in the language quoted above means that it intended all sorts of various purposes for the municipal IMF besides those that are related to the use of the public rights-of-way. Such an interpretation, however, obliterates the otherwise apparent meaning of section 5 and subsumes those purposes that are actually expressed in the provision. This is not how we interpret statutes. When construing a statute, this court evaluates it as a whole and interprets it, where possible, so that no term is rendered superfluous or meaningless. *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 270 (1998).

We believe that the best interpretation of the remaining language in section 5 is that it merely reflects the purpose that had been served by franchise fees. When the General Assembly abolished franchise fees and fashioned the municipal IMF in its place, the legislature must have been cognizant of the function that had been served by franchise fees, *i.e.*, that they were not necessarily in direct proportion to a municipality's regulatory costs. By using the term "including," the legislature apparently crafted the municipal IMF in such a way that it reflected the function of franchise fees. That is, the municipal IMF, like franchise fees, would be related to the recovery of regulatory costs involved with telecom-

munications activity on public property, whether or not the revenue generated by the municipal IMF was directly proportional to those costs.

Even though one could argue that the municipal IMF encompasses a broader purpose than the mere reimbursement of a municipality's regulatory costs, it was not intended to encompass a broader purpose than that of franchise fees. In addition to section 5, there are several other indicators which make it clear that the legislature had no broader purpose in mind than replacing franchise fees with a more uniform system. That is, the municipal IMF would do nothing more than create a statewide means of providing access to the public rights-of-way though the imposition of a uniform fee.

First of all, the title given to the municipal IMF illustrates its purpose. The legislature described the municipal IMF as a "[m]unicipal telecommunications infrastructure maintenance fee." See 35 ILCS 635/20 (West 1998). It is reasonable to assume that the legislature meant what it said: the municipal IMF is a *fee* imposed on those *telecommunications* providers that need to access the public rights-of-way in order to *maintain* their existing *infrastructure*. Obviously, the "maintenance" to the telecommunications infrastructure is being done by the telecommunications provider that owns the infrastructure, not the municipality. If the municipality is exacting a fee from the provider so that it can perform such maintenance, the question arises why the municipality would expect such a fee. Of course, the obvious conclusion is that the municipality is exacting the fee in exchange for allowing the provider to access the public rights-of-way, where much of the provider's infrastructure is located.

There is yet another factor which leads us to believe that the municipal IMF was intended as a charge for obtaining access to the public rights-of-way. As we

mentioned earlier, the Act contains three separate fees: the state IMF, the municipal IMF and the optional IMF. See 35 ILCS 635/15, 20 (West 1998). If a municipality has not enacted a municipal IMF, a telecommunications provider may pay the optional IMF to the state as a percentage of the gross charges "charged *** to service addresses in [that] particular municipality for telecommunications, originating or received in the municipality." 35 ILCS 635/15(c) (West 1998). By paying the optional IMF, the telecommunications provider gains access to the public rights-of-way in the municipality to which the fee relates. 35 ILCS 635/30 (West 1998). Because the optional IMF is "optional," a telecommunications provider only pays it if the provider needs to gain access to the public rights-of-way in a particular municipality.

Section 30 of the Act demonstrates that the municipal IMF serves the same function as the optional IMF. Section 30 provides that the payment of the municipal IMF (in a municipality that has enacted one) or the payment of the optional IMF (in a municipality that has not yet enacted a municipal IMF) gives the telecommunications provider the right to obtain access to the public rights-of-way in the municipality to which the fee pertains. 35 ILCS 635/30 (West 1998). A telecommunications provider may only elect to pay an optional IMF if there is no existing franchise fee agreement to which the provider is a party and the municipality has not imposed a municipal IMF. 35 ILCS 635/15(c) (West 1998).

If a municipality wishes to impose a municipal IMF, the Act prohibits the municipality from collecting the fee "during any period of time when a municipality receives any compensation other than the municipal [IMF] *** for a telecommunications retailer's use of the public right-of-way ***." 35 ILCS 635/25(d) (West 1998); see also 35 ILCS 635/25(e) (West 1998). In other words, the municipality may not collect both a franchise fee and the

municipal IMF because the fees are duplicative. That is, they perform the same function—allowing a telecommunications provider access to the public rights-of-way in exchange for the payment of a fee.

The Act provides yet another clue indicating the purpose of the municipal IMF. In section 35 of the Act, entitled "home rule," the Act states that a "home rule municipality may not impose franchise or other fees upon or require other compensation from telecommunications retailers for use of the public way, other than the municipal [IMF] authorized by this Act." 35 ILCS 635/35 (West 1998). The obvious implication contained in this provision is that the municipal IMF creates a *quid pro quo*: payment of the fee in exchange for access to the public rights-of-way.

All of these examples provide overwhelming textual evidence of the legislative purpose behind the municipal IMF. Based on these provisions, we find that it is unquestionable that the municipal IMF was intended as a uniform means of allowing telecommunications providers to have access to the public rights-of-way while giving municipalities compensation that they otherwise would have received in the form of a franchise fee.[3]

The circuit court, in its decision, discussed at great length the meaning of the phrase "use of the public right of way," as that phrase is employed in the Act. The circuit court first analyzed the "narrow" definition of the term "use," *i.e.*, the physical occupation of the public rights-of-way by the wires, poles, and other pieces of equipment owned by a telecommunications retailer. The "broad" definition, however, would include the act of leasing

---

[3]Although the circuit court discussed the federal Telecommunications Act at length in its memorandum opinion, we do not believe it is necessary in this case to speculate as to the effects that federal law might have had in forming the legislative intent behind the municipal IMF.

capacity from a landline provider for the purpose of completing wireless calls (since these calls often pass through the landline system, which is located in the public rights-of-way). Ultimately, the circuit court concluded that "under either definition of the term 'use[,]' the Municipal IMF offends the Uniformity Clause."

It is not necessary to analyze whether the "broad" definition of the term "use" would justify the classification created by the municipal IMF. It is clear from the text of the Act that the phrase "use of the public right of way" refers to the physical occupation of those rights-of-way by a telecommunication provider's infrastructure. For instance, section 25(e) of the Act describes a situation in which a municipality is still receiving "compensation from a telecommunications retailer [in the form of a franchise fee] for the use of the public right of way." 35 ILCS 635/25(e) (West 1998). In other words, the municipality is collecting the franchise fee in exchange for granting the telecommunications retailer the "use of the public right of way." As we just established, the only reason a telecommunications retailer would pay a franchise fee was to access the public rights-of-way for the purpose of installing or maintaining certain parts of its infrastructure. Thus, when section 25(e) explains the franchise fee agreement as the payment of a fee in exchange for "the use of the public right of way," we know exactly what the term "use of the public right of way" meant: the physical occupation of the public rights-of-way.

### III. Reasonable Classification

Now that we have established the object of the municipal IMF, we must determine whether that object is reasonably related to the class of entities to which the municipal IMF applies. See *Milwaukee Safeguard Insurance Co.*, 179 Ill. 2d at 98. If, as we have already established, the object of the municipal IMF is to replace franchise fees and establish a uniform system for allow-

ing telecommunications providers to access the public rights-of-way in exchange for the payment of a fee, it would be absurd to impose such a fee on wireless providers who do not own, operate, or maintain any equipment within the public rights-of-way. Wireless providers do not need to access the public rights-of-way in order to maintain their infrastructure, nor do they desire to establish an infrastructure where such access would be necessary in the future.

The defendants argue this very point, but for a different purpose. Rather than using this observation to establish that the classification created by the municipal IMF is unreasonable, the defendants attempt to establish thereby that by including wireless providers among those entities subject to the municipal IMF, the legislature demonstrated its desire to make wireless providers subject to the fee (in other words, the tax classification itself demonstrates the legislature's purpose in creating the fee). Under this theory, the classification created by the municipal IMF is reasonable because it fits the overall purpose of the legislation (to provide municipalities with a general source of revenue from both landline and wireless telecommunications activity). This argument is obviously circular. If the tax classification itself informs the inquiry regarding the purpose of the legislation (even in clear contravention of all other textual indications), any classification would inevitably survive a uniformity clause challenge. Such a rationale, however, renders the limitations contained in the uniformity clause utterly meaningless. Our precedents do not establish that the uniformity clause of our constitution is devoid of substance.

We find that the defendants in this case have failed to offer a sufficient legal justification for imposing the municipal IMF on a class of entities which includes wireless providers. As we established, the purpose of the municipal IMF is to create a fee whereby telecommunica-

tions providers are granted access to the public rights-of-way. Because wireless providers do not own, operate, or maintain any portion of their infrastructure within the public rights-of-way and do not need or desire to have access to the public rights-of-way for the purpose of installing any such infrastructure, it is unreasonable to include them within the class of entities subjected to the municipal IMF.

## IV. Facial Invalidation

We do not believe, however, that our conclusion on this matter suffices to render the municipal IMF facially invalid. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 95 L. Ed. 2d 697, 707, 107 S. Ct. 2095, 2100 (1987), quoted with approval in *In re C.E.*, 161 Ill. 2d 200, 210-11 (1994). The fact that the municipal IMF operates unconstitutionally as it applies to wireless providers is insufficient to render it wholly invalid. See *Salerno*, 481 U.S. at 745, 95 L. Ed. 2d at 707, 107 S. Ct. at 2100; *In re C.E.*, 161 Ill. 2d at 210-11.

In spite of this, the circuit court invalidated the municipal IMF on its face. We do not believe, however, that this case presented the circuit court with an all-or-nothing constitutional dilemma. By examining the trial judge's reasoning, we can understand the error that led him to believe that it did.

As previously discussed, in the portion of its opinion addressing the "narrow" and "broad" definitions of the phrase "use of the public right of way," the circuit court held that the municipal IMF would be invalid even under the "broad" definition of that phrase (which includes the mere leasing of landline capacity by a wireless provider) because the wireless provider's practice of leasing land-

line capacity is a much less intense "use of the public right of way" than that of the landline providers. As we have already demonstrated, the meaning of the phrase "use of the public right of way" is not so broad that it would include the mere leasing of landline capacity. Nonetheless, the circuit court held that even under the "broad" definition of that phrase, "it is wholly arbitrary to impose [the municipal IMF] on the gross charges of the Plaintiffs since they are plainly in a different category as to [their] use [of the public rights-of-way] than landline service providers who own, manage, control and maintain the lines located on the public rights-of-way." In other words, the circuit court invalidated the municipal IMF, at least in part, because the fee generated an amount of revenue which was in no way directly related to the intensity to which each type of provider "used" the public rights-of-way (under the "broad" definition of that term). Of course, a fee measured against the gross receipts of a telecommunications retailer would be invalid *per se* under such a rationale. It is difficult to conceive of a direct relationship that could be shown between a telecommunications provider's gross receipts and its use of the public rights-of-way.

In its holding on this matter, the circuit court relied heavily on the reasoning of this court in *City of Chicago Heights v. Public Service Co.*, 408 Ill. 310 (1951). In fact, much of the discussion in the parties' briefs is centered around that case. However, *City of Chicago Heights* is inapposite to our holding in this case. *City of Chicago Heights* involved the constitutionality of two franchise fees imposed by the City of Chicago Heights on the gross receipts of any telecommunications company that occupied the public rights-of-way within the city limits. See *City of Chicago Heights*, 408 Ill. at 316. In that case, we held that the franchise fees imposed by Chicago Heights violated the uniformity clause because a fee assessed as a

percentage of gross receipts "has no relation to the amount of space in a street used by wires or poles of a given company." *City of Chicago Heights*, 408 Ill. at 318. We struck down the fee, noting that it was "wholly lacking in uniformity, and *** purely arbitrary and discriminatory in its nature." *City of Chicago Heights*, 408 Ill. at 318.

In the present case, however, we determined that the municipal IMF is invalid in its application to the plaintiffs because the classification created by the fee is not reasonably related to the fee's purpose. The franchise fee in *City of Chicago Heights* was not challenged under this theory. As the above-quoted language demonstrates, the franchise fee in *City of Chicago Heights* was struck down because it taxed the members of the subject class in a nonuniform manner. *City of Chicago Heights*, 408 Ill. at 318. As the text of the uniformity clause indicates, however, a piece of legislation must first create a reasonable tax classification before a court can even reach the question of whether the members of that class are being taxed uniformly. See Ill. Const. 1970, art. IX, § 2. As we have just demonstrated, the municipal IMF fails to do so. To the extent the municipal IMF creates a classification that includes telecommunications providers who do not own or operate any of their infrastructure in the public rights-of-way, it is invalid. Of course, this description fits all of the plaintiffs in this case. It is not necessary for us, then, to address whether the municipal IMF operates uniformly upon the remaining members of the class who *do* own and operate part of their infrastructure within the public rights-of-way.

Not only is it unnecessary, it is improper. Our jurisdiction is restricted to cases which present an actual controversy, and we decline to issue advisory opinions on moot or abstract questions of law. *People ex rel. Partee v. Murphy*, 133 Ill. 2d 402, 408 (1990); *People ex rel. Black*

*v. Dukes*, 96 Ill. 2d 273, 276 (1983); *In re Marriage of Wright*, 89 Ill. 2d 498, 500 (1982). If the resolution of a certain question of law cannot affect the result as to the parties or controversy before it, the court should not resolve the question merely to set a precedent or to guide future litigation. *Segers v. Industrial Comm'n*, 191 Ill. 2d 421, 428 (2000); *In re Barbara H.*, 183 Ill. 2d 482, 491 (1998); *Murphy*, 133 Ill. 2d at 408.

## CONCLUSION

Accordingly, for the reasons given, we affirm the circuit court's order of summary judgment under count I of the complaint that found the municipal IMF to be in violation of article IX, section 2, of the Illinois Constitution. However, we do not find the municipal IMF to be invalid on its face. Rather, we find that the municipal IMF violates the uniformity clause only to the extent that it applies to telecommunications retailers who do not own, operate, or maintain any part of their infrastructure within the public rights-of-way.

*Affirmed.*

Dissenting Opinion Upon Denial of Rehearing

JUSTICE FREEMAN, dissenting:

The City of Chicago and the Illinois Commerce Commission (defendants) have filed a petition for rehearing in this cause. Because I believe that this court's opinion may have been in error, I respectfully dissent from the denial of the petition for rehearing.

The legislature enacted the Telecommunications Municipal Infrastructure Maintenance Fee Act (Act) (35 ILCS 635/1 *et seq.* (West 1998)), effective January 1, 1998. Section 5 of the Act provides in part:

"This Act is intended to abolish the invested capital tax on telecommunications retailers ***. This Act is also intended to abolish municipal franchise fees with respect to telecommunications retailers, create a uniform system for the col-

lection and distribution of fees associated with the privilege of use of the public right of way for telecommunications activity, and provide municipalities with a comprehensive method of compensation for telecommunications activity *including the recovery of reasonable costs of regulating the use of the public rights-of-way for telecommunications activity.*" 35 ILCS 635/5 (West 1998).

The invested capital tax (35 ILCS 610/2a.1 (West 1996)) had been imposed on invested capital of utilities. Municipal franchise fees were imposed by municipalities upon landline telecommunications retailers to compensate the municipalities for the use of the public rights-of-way by these retailers for telecommunications activity and the maintenance and repair of equipment in the public rights-of-way. The franchise fees included a percentage of all lease revenues that wireless telecommunications retailers paid to landline telecommunications retailers for their use of the equipment maintained by the landline telecommunications retailers in the public rights-of-way.

The Act replaced the invested capital tax and the franchise fees with a state infrastructure maintenance fee imposed upon landline telecommunications retailers (35 ILCS 635/15(a), (b) (West 1998)); an optional infrastructure maintenance fee imposed upon landline telecommunications retailers (35 ILCS 635/15(c), (d) (West 1998)); and a municipal telecommunications infrastructure maintenance fee imposed upon all telecommunications retailers, including wireless telecommunications retailers (Municipal IMF) (35 ILCS 635/20 (West 1998)).

Pursuant to section 20 of the Act, a municipality could impose a Municipal IMF upon telecommunications retailers by adopting an ordinance to that effect. If the municipality had a population of more than 500,000, it could impose a Municipal IMF of "2.0% of all gross charges charged by the telecommunications retailer to

service addresses in the municipality for telecommunications originating or received in the municipality." 35 ILCS 635/20(b) (West 1998). In a municipality with a population of 500,000 or fewer, the Municipal IMF was limited to "1.0% of all gross charges charged by the telecommunications retailer to service addresses in the municipality for telecommunications originating or received in the municipality." 35 ILCS 635/20(b) (West 1998).

The City of Chicago passed an ordinance imposing a Municipal IMF of 2% on "all gross charges charged by telecommunications retailers to a service address in the city for telecommunications originating or received in the city." Chicago Municipal Code § 3—75—030(A) (added October 1, 1997). Primeco Personal Communications, L.P., a wireless telecommunications retailer, and several other wireless telecommunications retailers (plaintiffs) filed an action for injunctive and declaratory relief.

Plaintiffs noted that wireless telecommunications retailers do not own or operate equipment in the public rights-of-way. Plaintiffs claimed that the purpose of the Municipal IMF was to compensate municipalities for the use of the public rights-of-way. Plaintiffs argued that the Municipal IMF violated the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, § 2) to the extent that the Municipal IMF applied to telecommunications retailers who do not own or operate any equipment in the public rights-of-way.

Defendants responded that the Municipal IMF was not a fee for the use of the public rights-of-way. Instead, the Municipal IMF was a tax imposed uniformly on telecommunications retailers. Defendants maintained that the Municipal IMF did not violate the uniformity clause.

This court held section 20 of the Act (35 ILCS 635/20 (West 1998)) invalid as applied to telecommunications

retailers who do not own, operate, or maintain any equipment in the public rights-of-way. Initially, this court noted that in a case involving a uniformity clause challenge it must ascertain the object or purpose of the taxing provision at issue. This court looked particularly to section 5 of the Act (35 ILCS 635/5 (West 1998)), entitled "Legislative intent," to ascertain that purpose. This court reasoned that the Municipal IMF was intended as a tool to compensate municipalities for the use of the public rights-of-way. As such, the Municipal IMF violated the uniformity clause because the Municipal IMF was imposed on both landline telecommunications retailers, that is, retailers who own, operate and maintain equipment in the public rights-of-way, and wireless telecommunications retailers, that is, retailers who do not own, operate or maintain equipment in the public rights-of-way.

In their petition for rehearing, defendants question this court's conclusion that the Municipal IMF was intended as a uniform means of compensating municipalities for allowing telecommunications retailers to have access to the public rights-of-way. Defendants maintain that the Municipal IMF was intended as a means of raising revenue from telecommunication activities, and not just a way to compensate municipalities for the costs they incur in allowing telecommunications retailers to have access to the public rights-of-way. Defendants note that, pursuant to sections 20 and 25 of the Act (35 ILCS 635/20, 25 (West 1998)), municipalities may collect the Municipal IMF from wireless telecommunications retailers. See also 35 ILCS 635/10(b), (d), (f) (West 1998). Given the clarity of these provisions, and assuming the legislature knew that wireless telecommunications retailers do not own, operate or maintain equipment in the public rights-of-way, defendants assert this court gave undue precedence to the Act's statement of legislative intent while ignoring the Act's substantive provisions.

Next, defendants assert that the Municipal IMF is a fair way of raising revenue from telecommunication activities. Defendants explain:

"[W]hile wireless retailers do not themselves need to install or repair equipment in public rights-of-way, they are critically dependent upon such equipment. Rather than place their own equipment in the public way, wireless retailers have chosen to rely on landline carriers to do this for them. Thus, it is reasonable to spread to wireless carriers a portion of the compensation that municipalities receive for granting landlines access to public rights-of-way, since wireless providers are critically dependent on the ability of landline carriers to obtain access to public rights-of-way in order to install and maintain equipment. For that reason, the General Assembly reasonably included wireless retailers within the class of telecommunications retailers that must compensate municipalities for granting landline carriers access to public rights-of-way. Indeed, as we explain above, wireless retailers previously contributed to the payment of franchise fees for landlines. For that reason, they could also be expected to contribute to the IMF, which replaced franchise revenues."

Finally, defendants maintain this court's opinion will have an adverse impact on "every municipal budget in Illinois" and will require "painful cuts in municipal services or borrowing at considerable cost to the taxpayers in order to plug budgetary shortfalls" resulting from the invalidation of the Act.

I believe that defendants have advanced considerations that merit rehearing by this court. I also find an additional reason for allowing the petition for rehearing in this court's failure to either follow or overrule our decision in *City of Chicago Heights v. Public Service Co.*, 408 Ill. 310 (1951). This court's attempt to distinguish *City of Chicago Heights* is unpersuasive.

The decision in this cause is of momentous import to the litigants and to the people of this state. The City of Chicago and numerous municipalities in the state stand to lose a great deal of revenue because this court has in-

validated the Municipal IMF. The municipalities will surely attempt to enact other taxing provisions to counter the loss of revenues from the Municipal IMF. Moreover, if the Municipal IMF is truly intended as a means to compensate municipalities for the use of the public rights-of-way, the legislature may well increase the fee that municipalities are allowed to collect from the land-line telecommunications retailers to make up for the loss of revenues from the wireless telecommunications retailers. Any increase in those fees would be passed on to users of landline telephones in this state. Given these circumstances and the arguments for rehearing outlined above, I believe this court errs in denying the petition for rehearing. I respectfully dissent.

JUSTICE McMORROW joins in this dissent.