2016 IL App (1st) 143485

SECOND DIVISION
March 1, 2016

No. 1-14-3485

| | | |
|---|---|---|
| CASEY'S MARKETING COMPANY, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRIAN HAMER, in His Official Capacity as | ) | No. 12 L 50991 |
| Director of the Illinois Department of Revenue, | ) | |
| THE ILLINOIS DEPARTMENT OF REVENUE, | ) | |
| and DAN RUTHERFORD, in His Capacity as | ) | |
| Treasurer of the State of Illinois,[1] | ) | |
| | ) | Honorable James M. McGing |
| Defendants-Appellees. | ) | Judge Presiding |

JUSTICE SIMON delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Neville concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal asks us to determine whether the most recent cigarette tax increase is

unconstitutional.   The appellant argues that it violates the uniformity clause of the Illinois

Constitution.   We conclude, as the trial court did, that the statute does not violate the

constitutional principle that the subjects within a class be taxed uniformly and, therefore, we

affirm.

---

[1] Since this case began, Constance Beard succeeded Hamer in the position of Director, and
Michael Frerichs succeeded Rutherford as Treasurer.   They are considered part of this appeal.

No. 14-3485

¶ 2                        BACKGROUND

¶ 3     Plaintiff Casey's Marketing Company operates several hundred convenience stores in Illinois and over a thousand in the country. The stores sell gasoline, groceries, other small goods and, importantly here, cigarettes. On June 14, 2012, the State enacted a law increasing the cigarette tax from 49 mills[2] per cigarette to 99 mills per cigarette, effective 10 days later. This increase was codified as an amendment to the Cigarette Tax Act (Act) (35 ILCS 130/1 *et seq.* (West 2012)) and lays out the manner in which the tax is to be imposed.

"Any retailer having cigarettes in his or her possession on June 24, 2012 to which tax stamps have been affixed is not required to pay the additional tax that begins on June 24, 2012 imposed by this amendatory Act of the 97th General Assembly on those stamped cigarettes. Any distributor having cigarettes in his or her possession on June 24, 2012 to which tax stamps have been affixed, and any distributor having stamps in his or her possession on June 24, 2012 that have not been affixed to packages of cigarettes before June 24, 2012, is required to pay the additional tax that begins on June 24, 2012 imposed by this amendatory Act of the 97th General Assembly to the extent the calendar year 2012 average monthly volume of cigarette stamps in the distributor's possession exceeds the average monthly volume of cigarette stamps purchased by the distributor in calendar year 2011. This payment, less the discount provided in subsection (b), is due when the distributor first makes a purchase of cigarette stamps on or after June 24, 2012 or on the first due date of a return under this Act occurring on or after June 24, 2012,

_____

[2] A "mill" is one-tenth of a cent. Wikipedia, "Mill (currency)," https://en.wikipedia.org/wiki/Mill_(currency) (last visited Feb. 26, 2016). It is a commonly used measure for cigarette taxes. *Id.*

whichever occurs first."   35 ILCS 130/2(a) (West 2012).

¶ 4     The State circulated a bulletin to advise all cigarette distributors about the tax.   The bulletin refers to the new law as a tax rate increase and advises distributors that their inventory might be subject to a floor tax.[3]   The State also supplied a form that the distributors were to use to determine if their inventory was subject to the tax and, if so, a method by which they could calculate the amount owed.

¶ 5     To paraphrase, the form directs distributors to:   Add the number of affixed and unaffixed tax stamps in your inventory as of December 31, 2011 to the number of tax stamps purchased this year (from January 1, 2012 to June 23, 2012).   Divide that result by 5.8.   That amount is the average number of stamps in your possession in 2012.   Then, take the average monthly tax stamps purchased in 2011 and subtract that amount from the average number of stamps in possession in 2012.[4]   If the result of that calculation was zero or negative (meaning the distributor, on average, possessed the same or less stamps in 2012 than it did in 2011), no floor tax was imposed.   If the

---

[3] A "floor tax" is a duty levied on inventory that a business already has on hand—a tax on products located on the shop "floor."   See *Mulligan v. Dunne*, 61 Ill. 2d 544, 552 (1975); USLegal, *Definitions*, "Floor Tax, Law & Legal Definition," http://definitions.uslegal.com/f/floor-tax/ (last visited Feb. 26, 2016).

[4] The form is from the Illinois Department of Revenue.   It is titled "RC-50 2012 Cigarette Floor Stock Tax Return."   Illinois Department of Revenue, RC-50 2012 Cigarette Floor Stock Tax Return, *available at* http://tax.illinois.gov/TaxForms/Misc/Cig/RC-50.pdf.   The full formula for distributors to determine if their inventory is subject to the tax is "Step 2" directives 6-12.

(6) Write the total number of stamps purchased in 2011.
(7) Figure your average monthly stamps purchased in 2011.
(8) From your 12/31/2011 Schedule CF, write the number of affixed and unaffixed stamps.
(9) Write the number of stamps you purchased from 1/1/2012 through 6/23/2012.
(10) Add Lines 8 and 9.
(11) Write the amount from Line 10 and divide it by 5.8. This is your average number of stamps in your possession in 2012.
(12) Subtract Line 7 from Line 11. This is the comparison of 2011 to 2012.
If the result is greater than zero (positive), write the result and continue to Step 3. Note: If the result is zero or less (negative), skip Steps 3 and 4. Go to Step 5.

result was positive (meaning, proportionally, more tax stamps were possessed in 2012), the distributor was instructed that it was subject to the tax and directed the distributor as to how the amount owed should be calculated.

¶ 6    Casey's was subject to the tax in the amount of $279,816.   It paid the tax under protest and, on July 17, 2012, filed a complaint seeking a declaration that the tax was invalid, demanding that its payment be refunded.   The basis of Casey's objection that is relevant to this appeal is that the tax increase violated the "uniformity clause" of the Illinois Constitution.[5]   The uniformity clause states that, "[i]n any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly."   Ill. Const. 1970, Art. IX, § 2.   The gist of Casey's argument on appeal is that the formula used by the State for determining who owed the tax and in what amount resulted in a disparate tax burden among almost every distributor without any lawful justification.

¶ 7    An understanding of some of the mechanics of the cigarette taxation process will be helpful going forward.   Generally, the taxes are imposed entirely on the "retailer," the one that sells the product to the end user.   35 ILCS 130/1; 2(a) (West 2012).   The "distributor," the manufacturer or wholesaler, prepays the tax to the State, receiving a tax stamp, and then collects the tax from the retailer.   *Id*.   The distributors are said to be "agent[s] for the State" for the purpose of collecting cigarette taxes.   *Heyman v. Mahin*, 49 Ill. 2d 284, 289 (1971).   Casey's is a distributor under the Act and its hundreds of convenience stores are retailers.

¶ 8    Section 2 of the statute, which imposes the tax, is rather lengthy.   Instead of using a new statutory section or replacing the section for each tax increase, the General Assembly has opted to just add to the existing section by amendment.   So the statute begins with the initial cigarette tax

_____

[5] In Casey's notice of appeal, it limited its challenge to the issue of uniformity.

of 5 1/2 mills per cigarette imposed in 1941 and is followed by several clauses that state something to the effect of "after this date of this year, there is an additional mill tax in this amount." Beginning in 1989, the General Assembly began to delve into taxing cigarettes in a distributor's possession based on whether the cigarettes had tax stamps affixed at the time the tax became effective; a type of floor tax. It was in the 1989 amendment that the General Assembly first began to refer to the distributor as the payer of the tax.[6] In 1993, for the first time, the General Assembly went forward with assessing what is considered to be a floor tax. The 1993 amendment states that "[a]ny distributor having cigarettes to which stamps have been affixed in his or her possession for sale at 12:01 a.m. on the effective date of this amendatory Act of 1993, is required to pay the additional tax imposed by this amendatory Act of 1993 on such stamped cigarettes." 35 ILCS 130/2(a) (West 2012). In the 1997 and 2002 tax increases, distributors were expressly not required to pay a tax on their stamped inventory. Since 1989, the floor tax has always been explicitly contemplated. In its 2012 tax increase, the General Assembly again imposed a floor tax. Instead of using the formula used in 1993, the General Assembly opted for the mathematic formula set forth above that based taxes upon the increase of the distributor's stamps in possession from the previous year. The outcome of the formula is what Casey's argues failed to produce uniform taxation.

¶ 9     The parties filed cross-motions for summary judgment. The State argued that the tax was valid. Casey's argued that the tax was invalid because the formula, based on the number of stamps possessed, resulted in a different tax on each distributor (or perhaps retailer) without any

_____

[6] The 1989 amendment states that "[a]ny *distributor* having cigarettes to which stamps have been affixed *in his possession* for sale on the effective date of this amendatory Act of 1989 *shall not be required to pay the additional tax* imposed by this amendatory Act of 1989." (Emphases added) Pub. Act 86-17, § 6 (eff. July 2, 1989).

constitutionally permissible classification or justification for the classification. The trial court entered summary judgment in favor of the State. The trial court found that the distributor is the "intended taxpayer" of the floor tax and that it was "not th[e] court's duty to redraw the lines for a 'better' tax." The court explained that the temporary difference in tax rates paid "appear[s] to be an unavoidable necessity."

¶ 10                                    ANALYSIS

¶ 11    We review the grant of summary judgment *de novo*. *Illinois Tool Works Inc. v. Travelers Casualty & Surety Co.*, 2015 IL App (1st) 132350, ¶ 8. Summary judgment is appropriate when the pleadings, depositions, admissions, and affidavits, viewed in a light most favorable to the nonmovant, fail to establish a genuine issue of material fact, thereby entitling the moving party to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2012); *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 215 Ill. 2d 121, 127-28 (2005). If disputes as to material facts exist or if reasonable minds may differ with respect to the inferences drawn from the evidence, summary judgment may not be granted. *Associated Underwriters of America Agency, Inc. v. McCarthy*, 356 Ill. App. 3d 1010, 1016-17 (2005). However, when parties file cross-motions for summary judgment, they agree that no genuine issues of material fact exist and that the dispute involves only questions of law, which the court may decide based on the record. *Illinois Tool Works*, 2015 IL App (1st) 132350, ¶ 8. We also review the constitutionality of a statute *de novo*. *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 69 (2008). We are to uphold a statute as constitutional whenever reasonably possible. *Arangold Corp. v. Zehnder*, 204 Ill. 2d 142, 146 (2003).

¶ 12    Casey's argues that the trial court erred by finding that the distributor was the "intended

taxpayer" of the 2012 tax increase. To support its argument, it points to certain references in section 2 of the Act to that effect, such as the very first sentence which states that "[a] tax is imposed upon any person engaged in business as a retailer of cigarettes in this State." 35 ILCS 130/2(a) (West 2012). Casey's also points to case law that it believes confirms its position that, under the Act, "the incidence of the tax is clearly on the retailer and not on the distributor." *Heyman v. Mahin*, 49 Ill. 2d 284, 288-89 (1971).

¶ 13 But Casey's proffered interpretation is based upon a pre-1989 construction of the Act, before the General Assembly began to phrase amendments in a way that contemplated computing the tax at the point the cigarettes were in the distributor's inventory. In 1993, the General Assembly explicitly placed a tax on the distributors' inventory, but at the same time it expressly imposed the tax on retailers too. 35 ILCS 130/2(a) (West 2012). The difference really only deals with the point at which the tax is assessed. The General Assembly has varied its approach on what point in the supply chain the tax becomes effective. In 1993 and 2012 for example, the General Assembly exempted current retail inventory from the tax, but taxed all current wholesale inventory. This meant that retailers paid the tax increase on all orders subsequent to the tax becoming effective. In 1989, 1997, and 2002, the General Assembly exempted all current inventory, both wholesale and retail. This meant that, beginning only on the effective date, distributors started to buy tax stamps evidencing the increase on all purchases going forward.

¶ 14 The language throughout this section is inartful, but, as evidenced by the 1993 amendment and the subsequent amendments that contemplate the idea, there is nothing in the Act that prohibits a floor tax on wholesale inventory. The section's opening clause declares that it imposes a tax on "any person engaged in business as a retailer of cigarettes in this State," and later states that "[t]he

impact of the tax levied by this Act is imposed upon the retailer." *Id*. The 2012 amendment is phrased differently. It expressly states that the "distributor *** is required to pay the additional tax." *Id*. In the end, however, the distributor is still prepaying the tax. It pays the 2012 floor tax on its inventory and then passes the cost along to retailers who are, after the effective date, paying a price that includes the tax. It is still the retailer that ultimately pays for the tax increase. The distributors pay the taxes to the State and the retailers reimburse them.

¶ 15    Casey's argues that whether a *retailer* paid the tax increase "hung entirely on the arbitrary choice by the retailer *** to purchase from one distributor or another," and that certain retailers "randomly escaped" paying the tax increase. But once the tax increase was effective, all purchases by the retailer were subject to the tax. "Beginning on June 24, 2012, in addition to any other tax imposed by this Act, a tax is imposed upon any person engaged in business as a retailer of cigarettes at the rate of 50 mills per cigarette sold or otherwise disposed of in the course of such business in this State." *Id*. The retailers all paid the tax, it is just that some distributers might have received a different return based on the floor tax formula. Casey's argument is hard to follow at times, but it is clear that it is suing as a distributor, so its repeated objections from the point of view of the retailer are unavailing. It lacks standing to challenge the tax's impact on retailers.

¶ 16    The potentially colorable claim that Casey's makes for unconstitutionality does not turn on the identity of the taxpayer, it turns on whether the General Assembly's method of implementing the tax violated the uniformity clause by perhaps requiring some distributors to pay the tax at a different rate than other distributors. The retailers all paid the same tax rate after the tax increase went into effect, but certain discrepancies might have resulted on the distributors' end as a result of

the floor tax formula. Some distributors' inventory might have escaped the floor tax altogether or they might have paid a lesser rate, giving them either a potential competitive advantage or the possibility of an increased return.

¶ 17 The "uniformity clause" provides that "[i]n any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly." Ill. Const. 1970, art. IX, § 2. There are two separate requirements contained in that sentence. *Primeco Personal Communications, L.P. v. Illinois Commerce Comm'n*, 196 Ill. 2d 70, 84 (2001). The first is that the General Assembly must classify the subjects of nonproperty taxes reasonably. *Id.* Then, once a reasonable classification has been established, the second requirement is that the members of that class must be taxed uniformly. *Id.* The first prong of the "reasonable classification test" compares and contrasts the class of taxed entities with those that are not taxed. *Id.* at 84 n. 2.

¶ 18 Here, Casey's fails to make completely clear what classification its uniformity challenge is based upon. We presume the argument is directed at the outcome of the tax increase and at the differences between some distributors that were required to prepay the floor tax and the ones that were exempt or paid a different rate. But at times during its argument it seems that the classification it is challenging is the disparate effect on retailers and distributors. We will nonetheless focus on the former, because, as explained above, the allegedly disparate treatment of distributors is the only potentially viable claim available to Casey's.

¶ 19 Focusing on the first part of the analysis, we must decide whether the classification made between distributors was reasonable. To determine whether the subjects of nonproperty taxes are classified reasonably, the classification must (1) be based on a real and substantial difference

between the people taxed and those not taxed, and (2) bear some reasonable relationship to the object of the legislation or to public policy. *Empress Casino Joliet*, 231 Ill. 2d at 69. The reasons justifying the classification do not need to appear on the face of the statute, and the classification must be upheld if any set of facts reasonably can be conceived that would sustain it. *Id*. at 76.

¶ 20    The tax is applied to *any distributor* having cigarettes in his or her possession on June 24, 2012 to which tax stamps have been affixed, and *any distributor* having stamps in his or her possession on June 24, 2012 that have not been affixed. A serious argument can be made that the General Assembly has not "classified" the potential taxpayers at all. The General Assembly does not make any specific attempt at "classifying the subjects or objects of nonproperty taxes" that the constitution sometimes forbids. Thus, it is not even clear that there could be a uniformity issue at all because, on its face, the tax applies equally to all distributors meeting the statutory criteria. See *Sun Life Assurance Co. of Canada v. Manna*, 227 Ill. 2d 128, 137-38 (2007) (where a tax treats all foreign companies uniformly as a class, exempting all Illinois companies presents no uniformity issue); *American Beverage Ass'n v. City of Chicago*, 404 Ill. App. 3d 682, 691 (2010) (a tax that applies to all noncarbonated water, but that does not apply to flavored or carbonated water satisfies the first prong of the uniformity analysis); see also *Primeco Personal Communications*, 196 Ill. 2d at 84 n.2.

¶ 21    However, assuming the outcome of the tax formula creates classes among distributors, we nonetheless find that the supposed classifications are based on substantial differences between distributors and bear a reasonable relationship to a legitimate legislative interest. The General Assembly has no evidentiary burden and is not required to produce facts in support of its

justification for the statute. *Wirtz v. Quinn,* 2011 IL 111903, ¶ 83. Instead, once the government has offered a reason for its classification, the plaintiff has the burden to show that the defendant's explanation is insufficient as a matter of law or unsupported by the facts. *Id.* A minimum standard of reasonableness is all that is required. *Arangold Corp.*, 204 Ill. 2d at 155.

¶ 22 Whether the "classifications" drawn by the General Assembly are based on real and substantial differences between distributors and whether those supposed disparities bear some reasonable relationship to the object of the legislation are fairly interrelated in this case. Thus, those two requirements have been, as they should be, considered and treated separately but, because of the significant overlap here, they are addressed together in the subsequent analysis.

¶ 23 One legitimate justification for the General Assembly's choice to employ the formula that it did to implement the tax increase is the reasonable objective of implementing the tax based on volume. The floor tax only applied *to the extent* that the calendar year 2012 average monthly volume of cigarette stamps in the distributor's possession exceeded the average monthly volume of stamps purchased by the distributor in calendar year 2011. The tax is on the volume of the distributor's activity. The General Assembly imposed a tax increase on the year-over-year increase in stamps in a distributor's inventory. Of course, the purpose of the General Assembly's action to increase the tax was to raise revenue. By using the increased stamps in possession for 2012, the General Assembly was able to account for distributor's increased activity whether it was

innocent or by design.[7]   For example, by taking all of the 2012 stamps in possession into account, the General Assembly was able to prevent any distributor from purchasing stamps in advance of the increase to avoid its impact.   The General Assembly's method even prevented against unintentional surplus accumulations based on, perhaps, a company's purchasing methods.   The increase took the broader view of taxing the increase for the calendar year.   The end result is that each distributor's tax burden was designed to be proportionally the same in 2012 as it was in 2011—a reasonable means of implementing the tax increase.

¶ 24      Another legitimate justification would be similar to one found to be valid in *Empress Casino Joliet*, where the court found that it was permissible to impose a tax assessed on one's current economic activity.   In that case, the General Assembly assessed a tax by way of a surcharge on only those casinos whose adjusted gross receipts were more than $200 million. *Empress Casino Joliet*, 231 Ill. 2d at 76.   The logic behind the means employed by the General Assembly in that case was that those businesses with that current-higher economic activity could absorb the tax burden on their greater rate of economic activity.   *Id*. at 78; see also *DeWoskin v. Loew's Chicago Cinema, Inc.*, 306 Ill. App. 3d 504, 521 (1999) (it is permissible to take into account the frequency with which one engages in the activity upon which taxation is imposed). The same is true here where the General Assembly chose to implement the tax increase on the distributors' increased performance in the market in that current year.   It was reasonable for the legislature to conclude that those distributors should be proportionally reimbursed at 2011 prices

---

[7] To the extent the formula employed by the General Assembly could be considered a "retroactive tax," Casey's has not raised and has, thus, forfeited that argument.   Nonetheless, a retroactive tax measure does not necessarily violate the due process provisions of either the Illinois or the Federal constitutions. *Commonwealth Edison County v. Will Co. Collector*, 196 Ill. 2d 27, 43 (2001) (citing U.S. Const., amends V, XIV, and Ill Const. 1970, art I, § 2.   The measure employed here, as explained throughout the opinion, is a valid method for assessing the tax and cannot in any way be considered so "harsh and oppressive as to transgress the constitutional limitation."   See *id*.

for tax stamps bought in 2011, and at the same proportion be reimbursed at post-increase prices for tax stamps bought in 2012.

¶ 25    As the trial court observed, this one-time tax increase did have the potential to result in some discrepancies among distributors during the transitional period.   But as it also recognized, there can be discrepancies when the tax is made only on a distributor's future purchases like in 1997 and 2002.   In those years, distributors that, either intentionally or unintentionally, hoarded cigarettes before the tax became effective ended up paying a lower effective tax rate thereby getting a type of windfall on the opposite side of the supply chain.   When the tax is imposed in that manner, distributors that have surplus inventory (like Casey's does here) benefit and those with less stamps in their possession are negatively affected with an overall higher effective tax burden.   Although the result of a change in taxation produces some inequality, if its framework is reasonably drawn, the law does not violate the uniformity clause.   *Arangold Corp. v. Zehnder*, 329 Ill. App. 3d 781, 793 (2002), *aff'd*, 204 Ill. 2d 142 (2003).   There were other means that the General Assembly could have chosen; like using the same means as the 1993 floor tax as Casey's suggests.   But it is not our place to second guess the wisdom of a statute that is rationally related to a legitimate state interest.   *Crusius v. Illinois Gaming Board*, 216 Ill. 2d 315, 332 (2005).

¶ 26    A few final points.   All taxes prepaid by Casey's as a result of the increase will be repaid to it by retailers.   Everything that Casey's paid to the State was fully chargeable to the next party down the chain of distribution, so it effectively has no loss.[8]   In addition, and importantly, Casey's did not submit any evidence that could potentially show that the tax actually impacted some distributors differently than others.   There was no evidence from which the trial court could have

---

[8] We recognize that all of the retailers that Casey's distributes to are under the "Casey's" umbrella. But legally this makes no difference.   Casey's chose to sue only in its capacity as a distributor.

No. 14-3485

found a lack of uniformity. Casey's did not put forth any evidence that the tax increase did not apply uniformly in practice or, perhaps more significant, that it was adversely affected as compared to other distributors.

¶ 27                                    CONCLUSION

¶ 28    The lack of clarity in Casey's argument makes it difficult to nail down certain positions it advances. But the heart of the appeal is whether the 2012 cigarette tax increase violated the uniformity clause by affecting particular distributors differently than others. Because the statute on its face applies to all similarly situated distributors, we do not believe that uniformity concerns are even properly at issue. To the extent that they arise as a result of how the tax is assessed in practice, there are various justifications for the means chosen by the General Assembly to effectuate its policy positions. After all, the uniformity clause was designed to enforce minimum standards of reasonableness and fairness between groups of taxpayers (*Arangold Corp.*, 204 Ill. 2d at 153) and if a set of facts can be reasonably conceived that would sustain a classification, it must be upheld. *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 248 (1992). The scope of a court's inquiry into classifications and their reasonableness is narrow. *Id*. On that narrow inquiry, we agree with the trial court that the 2012 amendment to the Act does not violate the constitutional principle that the subjects within a class be taxed uniformly.

¶ 29    Based on the foregoing, we affirm.

¶ 30    Affirmed.