2025 IL App (1st) 232327-U

SECOND DIVISION
June 24, 2025

No. 1-23-2327

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| ALEXANDER UZUBELL, and JOSEPH and SUSAN UZUBELL, as parents and next of kin of Bradley Uzubell, a Minor, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | No. 21 L 3892 |
| v. | ) | |
| | ) | |
| MOUNT CARMEL HIGH SCHOOL, | ) | |
| | ) | Honorable Jerry A. Esrig, |
| Defendant-Appellee. | ) | Judge Presiding |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

ORDER

¶ 1    *Held*: We affirm the trial court's order granting summary judgment to defendant. The decision by the defendant high school to expel students who were found to be responsible for offensive and divisive social media accounts was not arbitrary or capricious.

¶ 2    Plaintiff Alexander Uzubell and his brother Bradley, a minor who is represented by his parents Joseph and Susan Uzubell, filed this case against their former school, defendant Mount Carmel High School, seeking money damages for breach of contract. After a police investigation identified plaintiffs as creators of Instagram accounts where numerous divisive comments on the

issues of race, sexual orientation, gender, and religion were posted, and invited others to a meetup, the Principal of Mount Carmel High School gave plaintiffs the option to either withdraw from the school or face expulsion. Plaintiffs withdrew from the school.

¶ 3    Plaintiffs subsequently tried to walk back the withdrawal, and they later filed a complaint in the circuit court alleging that they were coerced by Mount Carmel into withdrawing from the school even though they were not responsible for the offensive accounts. They argued that Mount Carmel breached the terms of its Parent-Student Handbook when it essentially expelled them without giving them a disciplinary hearing. The parties filed cross-motions for summary judgment. The trial court granted summary judgment in favor of Mount Carmel and denied plaintiffs' motion for summary judgment, finding that plaintiffs were required to produce some evidence that Mount Carmel acted arbitrarily and capriciously but failed to do so. Plaintiffs now appeal the trial court's grant of summary judgment. For the following reasons, we affirm.

¶ 4                                    BACKGROUND

¶ 5    The following summary is taken from the pleadings, depositions, admissions and affidavits in support of and opposition to the cross-motions for summary judgment. In the 2020-2021 school year, plaintiffs Alexander Uzubell and Bradley Uzubell were enrolled as students at defendant Mount Carmel High School. Alexander was a senior and Bradley was a sophomore.

¶ 6    In early 2021, an Instagram account created by Bradley (@NONE47474) was given the name "White Student Union of Lake Central High School." Lake Central High School is a neighboring high school in the same area as Mount Carmel. As a profile photo, the Instagram account had the Lake Central High School logo on top of a confederate flag. On this account, the user posted numerous divisive comments on the issues of race, sexual orientation, gender, and

religion. The Instagram post encouraged members to meet up at a local Walmart store at a specific date and time.

- "It has come to our attention that the straight white Christian males at LCHS have been under attack for too long. We decided it was time to do something. Join the union, be something."

- "(No women's rights either!!!!!)" "Suggestions on how to make lchs straight, white, and Christian again."

- "Ask yourself: do white lives matter? Do men's lives matter? Do straight lives matter? If you say no, you are the problem that we are trying to expose."

- "Men are under attack, give ideas to fix it."

- "Straight people are under attack, give ideas to help fix that."

- "White people are under attack, idea to help fix it."

- A poll asking: "What's Worse, KKK or BLM?" The result of this polling question was 77% KKK and 23% BLM.

- A poll asking: "Are there too many lgbtq members at lchs?" The results of this polling question was 62% yes and 38% no.

- "ATTENTION Since a lot of you are demanding we reveal ourselves and we're sure you guys won't actually do anything We've decided to meet you in public TOMORROW at the schererville Walmart at 5:30 p.m. See post for more details."

- "Meet us at 5:30 p.m. at schererville Walmart IN THE BACK OF THE PARKING LOT. We will bring out the top 4 highest ranking members of the union only, everyone else stays secret. You will know it is us because we will get out of the car and sit on the ground, we will also scream slurs if you idiots still can't figure out who it is. DO NOT

3

bring weapons, we will try to have nice face to face convos. And we know damn well all those who have been talking trash won't even show up or do anything. U guys all talk"

¶ 7 The posts on this White Student Union account generated hundreds of replies with heated arguments developing. The account caused severe disruptions at Lake Central High School and in the community. Parents of students expressed fears to the school administration about their children's safety at school. The school received phone calls from parents who were upset about the posts. Numerous students met with school counselors to deal with the distress the account was causing. Due to students and parents becoming involved in heated arguments, the school administrators and the school resource officer believed that something needed to be done about the account. Three separate police departments became involved in the investigation.

¶ 8 Another Instagram account, Hispanic Union of Lake Central High School, was created around the same time as the White Student Union account. The Hispanic Union account posted similar material to the White Student Union account and was also making students upset. The bio for the Hispanic Union stated that it was "here to bring the white student union down."

¶ 9 When Lake Central administrators became aware of the Instagram accounts on March 3, 2021, Principal Sean Begley began an investigation. Principal Begley contacted the school's resource officer, Corporal Jerry Patrick, who was an officer of the Dyer, Indiana police force. Cpl. Patrick interviewed approximately 30 students, dozens of parents, school administrators, and other police officers to identify the individual or individuals behind the Instagram account.

¶ 10 As a result of the investigation, Cpl. Patrick learned that Bradley and Alexander Uzubell were responsible for creating and posting on the Instagram accounts. Bradley had been disciplined the previous year by Mount Carmel High School for posting racially charged comments on Snapchat.

"Listen up snowflake and let this sink in… I never owned any slaves and you never picked any cotton, BLM, KKK, Antifa and Communists are all from the same feather. Here ends the lesson. I DON'T OWE YOU SHIT!"

¶ 11    Principal Begley, Cpl. Patrick, and Detective Chris Widen went to the Uzubells' home to investigate. The boys' father, Joseph Uzubell, answered the door, and he invited the men to speak with his sons. According to the investigators, during their conversation at the Uzubells' home, Bradley Uzubell freely admitted that he created the White Student Union account and posted content on that account.  Alexander Uzubell freely admitted that he created the Hispanic Union account and posted content on that account. Cpl. Patrick asked the Uzubell boys to take down the Instagram accounts and the Instagram accounts were both taken down by the time the investigators left the home. The investigators witnessed Bradly delete one of the accounts on his phone. According to Cpl. Patrick, the Uzubells did not indicate that anyone else was involved with the Instagram accounts.

¶ 12    The Uzubells allege that they were given assurances by Cpl. Patrick, Detective Widen, and Principal Begley that Mount Carmel High School would not be notified about the Instagram posts or the investigation. The Uzubells also present a far different account of their meeting with the investigators. The Uzubells claim that they never told the investigators that they wrote any of the messages in question. Instead, Alexander merely told the men that he had the login information for the White Student Union account and could take it down, but did not acknowledge naming the account or posting any content there.

¶ 13    The Uzubells claim that, upon coming into their home, Cpl. Patrick began yelling and making accusations against the boys while having his hands on his service weapon.

5

¶ 14    The Uzubells claim that Bradley Uzubell gave his Instagram login information to another student, Francis Krembs, who had his social media privileges taken away. According to the Uzubells, Krembs created the White Student Union account and was responsible for all of the content posted there. The Uzubell boys were allegedly not even aware of what Krembs was doing on Instagram under Bradley's account and neither of them were responsible for anything posted there. Bradley never accessed the account after creating it and giving the login information to Krembs, and Bradley was not involved with anything done on that account thereafter. Bradley Uzubell became aware of the White Student Union account through the media. Alexander became aware of the account because Krembs was bragging about the account on Snapchat, and Alexander became aware of the Hispanic Union account in the same way.

¶ 15    After Principal Begley and the officers went to the Uzubells' home and got the relevant Instagram accounts taken down, Principal Begley emailed the Dean of Students and Vice Principal at Mount Carmel High School where the Uzubells were enrolled. In the email, Principal Begley informed the Mount Carmel administrators about the Instagram accounts and the posts that the Uzubells had authored and had taken down after meeting with the investigators. The Dean of Students, Dan O'Connor, forwarded Principal Begley's email to Mount Carmel Principal Scott Tabernacki for further investigation. Principal Tabernacki spoke to Principal Begley who confirmed the results of the investigation and detailed the impact the posts had on the Lake Central community.

¶ 16    After speaking to Principal Begley, Principal Tabernacki spoke with Cpl. Patrick who confirmed the Uzubells' involvement with the Instagram accounts. Cpl. Patrick confirmed the details in Principal Begley's email, and Cpl. Patrick told Principal Tabernacki that "both boys had admitted to it" and "both boys were visibly upset." Cpl. Patrick confirmed to Principal

Tabernacki in that phone call that the Uzubell brothers admitted to making the Instagram posts in question, and Cpl. Patrick informed Principal Tabernacki that the police officers were able to track the IP address from the Instagram postings which led them to the Uzubells' home. That same day, Francis Krembs called Principal Tabernacki. Krembs told Principal Tabernacki that he was aware of the Instagram accounts but was not involved with them.

¶ 17    The Uzubells claim that Principal Tabernacki fabricated many of the details about his investigation into the Instagram accounts. The Uzubells point to deposition testimony from Principal Begley and Cpl. Patrick in which they both denied that they spoke by phone to Principal Tabernacki on March 11, 2021.

¶ 18    Principal Tabernacki testified in his deposition that on March 11, 2021, after speaking to Principal Begley, Cpl. Patrick, and Francis Krembs, he called Joseph and Susan Uzubell and spoke to them about their sons' involvement with the Instagram accounts. Bradley and Alexander Uzubell were parties to the phone call as well. Principal Tabernacki testified that he informed the parents that their sons could withdraw from the school or go through the discipline board hearing process, which could result in discipline up to expulsion. The Uzubells, however, claim that Principal Tabernacki only offered them the options of either withdrawing from the school or being expelled. According to the Uzubells, Principal Tabernacki gave them until 2 p.m. that same day, just a few hours later, to decide whether to withdraw or face expulsion.

¶ 19    Joseph Uzubell testified at a deposition that, after Principal Tabernacki told the family the only options were to withdraw or face expulsion, he looked at the school handbook and did not believe his sons' conduct met the criteria for direct expulsion. Joseph testified that Principal Tabernacki never brought up the disciplinary board process, but instead Joseph was the one who asked Principal Tabernacki about the disciplinary review board. According to Joseph, Principal

Tabernacki told him the disciplinary board process would be a waste of time, and his sons would be found guilty. According to the Uzubells, Principal Tabernacki told them that if the boys voluntarily withdrew from the school, their records would simply reflect a withdrawal and they could easily transfer into another school. If, however, the Uzubell brothers took the expulsion route, they would not be able to return to school until the second semester of the following year. The Uzubells claim that Principal Tabernacki never even spoke to the boys or inquired of them whether they had actually created the Instagram accounts or any of the posts.

¶ 20 Principal Tabernacki testified at his deposition that Susan Uzubell inquired during their conversation about whether Alexander could continue at Mount Carmel if Bradley took full responsibility. Alexander was a senior and was close to graduating. Principal Tabernacki informed the Uzubells that Bradley taking full responsibility was not an option. Bradley told Principal Tabernacki on that phone call that he took responsibility for the Instagram accounts.

¶ 21 Before 2:00 p.m. on March 11, 2021, Joseph Uzubell called Principal Tabernacki and informed him that Bradley and Alexander would be withdrawing from Mount Carmel. The Uzubell brothers' withdrawal was processed thereafter.

¶ 22 The day after the Uzubell brothers withdrew from Mount Carmel, on March 12, 2021, Bradley sent an email to Principal Tabernacki in which he claimed that Krembs "was more involved than what has been said." Bradley continued that Krembs "actually posted most of the content that created havoc." Bradley referred to a similar White Student Union Instagram account created for Crown Point, a neighboring town, and Bradley stated that he "had no connection to that page whatsoever." Bradley requested of Principal Tabernacki that he have the opportunity to tell his side of the story.

¶ 23    On March 15, 2021, a disciplinary hearing was held for Krembs. Following the hearing, Krembs received a three day out-of-school suspension. There is no record of the content of the proceedings.

¶ 24    The Uzubells contacted Principal Tabernacki and other Mount Carmel staff to try to undo Alexander's withdrawal. On March 17, 2021, Susan Uzubell offered to make a donation to Mount Carmel or engage in other fundraising opportunities so that Alexander could continue towards receiving his diploma from the school. Susan emphasized to Principal Tabernacki in that email "how [Alexander] had little to do with the controversial website" and that he "was just trying to protect his brother by taking the blame." On March 23, 2021, Joseph Uzubell sent an email to various staff members at Mount Carmel requesting to appeal Alexander's "dismissal." He emphasized that "Alexander did not have an active role in the Instagram posts." Joseph explained that he wanted Alexander to have a chance to clear his name, as nothing was more important to Joseph than seeing Alexander graduate from Mount Carmel.

¶ 25    Susan Uzubell sent another email on March 25, 2021, this time to various staff members at Mount Carmel, requesting a formal discipline review board hearing for Alexander. On the same day, Bradley Uzubell sent an email to various staff members. Bradley apologized for the incident occurring and "t[ook] responsibility for [his] actions and involvement within this incident." Bradley reiterated that his brother was protecting him in front of the police and "was not involved in the idea of the web page." Bradley stated that Alexander deserved to have a discipline review board hearing to have the opportunity to clear his name.

¶ 26    On March 26, 2021, Principal Tabernacki sent a letter to the Uzubells indicating that the Uzubells' requests to appeal or undo their withdrawals would not be allowed. Principal Tabernacki indicated that he discussed the matter with the Dean of Students and the school's

President and the three men came to a consensus that the Uzubells' status would not change and both students would remain withdrawn on the official student record.

¶ 27   On March 29, 2021, Susan Uzubell emailed Father James Lewis, the guidance counselor at Mount Carmel. She asked Father Lewis to help Alexander get a second chance. Susan explained that Bradley was heartbroken that his brother could not get back into Mount Carmel "all due to Brad's involvement" in the offending Instagram accounts. Susan explained that Alexander was protecting Bradley and pled for Alexander to have the opportunity to achieve a high school diploma at Mount Carmel. On that same day, Alexander himself emailed the faculty at Mount Carmel and asked "to appeal the decision that [he] be dismissed from Mount Carmel." Alexander stated that he and his brother were coerced by the investigators, and he protected his brother "not fully knowing about all of his [brother's] interactions with the page and the third party involvement as well." Alexander requested a discipline review board hearing and requested to discuss with the administration the possibility of finding some pathway toward achieving a Mount Carmel diploma.

¶ 28   On March 29, 2021, Susan Uzubell sent an email to Principal Tabernacki asking for a second chance for Alexander. Her email was mostly identical to the email she sent to Father Lewis a few days earlier. Susan stressed that Alexander had no direct involvement in the Instagram posts and the family was being torn apart "all due to Brad's involvement" in the ordeal. Susan Uzubell testified in her deposition that they were requesting the relief for Alexander and not Bradley because they were working one step at a time.

¶ 29   On April 13, 2021, the Uzubells filed this lawsuit against Mount Carmel. In their complaint, the Uzubells seek money damages for Mount Carmel's alleged breach of contract. The Uzubells claim that Mount Carmel breached the terms of the school's student handbook in

the manner in which it handled their discipline. The Uzubells stated in their complaint that Krembs was the one responsible for the Instagram accounts. They further stated that they did not engage in any conduct that would warrant expulsion from the school without a hearing under the terms of the handbook. They also stated that no disciplinary review hearing was held, so the school could not expel them under the terms of the handbook.

¶ 30    Mount Carmel's Parent-Student Handbook for the 2020-2021 school year sets forth the behavioral expectations and the discipline policies for the students. The Handbook sets forth the types of "corrective responses" that may be implemented if a student violates school policy. The corrective responses begin with a classroom detention, move to a tiered system of referrals, and then onto suspension and expulsion. The Handbook explains that certain infractions may lead to a suspension or an appearance before the Faculty Disciplinary Review Board. A list of prohibited conduct that falls within that category follows, with conduct such as fighting, hazing, and bullying being included.

¶ 31    The Handbook establishes that the Discipline Review Board convenes at the direction of the principal or Dean of Students when a student is facing expulsion. A list of prohibited conduct that could lead to the Discipline Review Board being convened follows, with conduct such as physically assaulting another student, gross insubordination, damaging the reputation of Mount Carmel, and defacing or destroying school property being included. When the Discipline Review Board is convened, it makes a recommendation to the principal and the principal is charged with deciding what action to take.

¶ 32    The Handbook also contains a section dealing exclusively with expulsion from the school.

"Expulsion: Mount Carmel High School will dismiss a student summarily who has damaged seriously the reputation of the school or whose conduct threatens the physical, moral or intellectual welfare of the school community.

The administration may expel any student without hearing for the offenses listed below. In addition, when required by law, police and school community will be notified.

- Possession or use of a weapon;

- Setting false fire alarms;

- Bomb threats and other threats to commit violence;

- Inciting mob action;

- Selling/distributing illegal materials (i.e., drugs, alcohol, prescription medication, pirated music/movies);

- Exceeding 20 discipline points in one school year;

- Violating a probationary contract."

The Handbook also includes a catchall provision to capture misconduct that is not specifically delineated elsewhere.

"Other Prohibited Behaviors: When necessary appropriate actions will be taken for any behavior that is unsafe, disrespectful, or inconsistent with school values."

¶ 33    The Handbook contains a disclaimer provision stating that "[t]his handbook does not establish a contractual relationship between Mount Carmel High School and its parents and students, but serves only to highlight the school's general policies, practices, and procedures." The Handbook further states that "[i]t cannot be construed as a legal document of any kind."

¶ 34    Mount Carmel filed a motion to dismiss the lawsuit, which was granted in part and denied in part. The trial court struck the paragraph of the complaint in which the Uzubells alleged that the school handbook created an express contract between themselves and the school. The trial court allowed the Uzubells to go forward on a claim for breach of an implied contract. Mount Carmel answered the complaint, and the parties initiated written and oral discovery.

¶ 35    The parties filed cross-motions for summary judgment. The motions were briefed by the parties, and a hearing on the motion was held by the trial court. The trial court denied the Uzubells' motion for summary judgment and granted Mount Carmel's motion. In granting summary judgment in Mount Carmel's favor, the trial court gave a lengthy explanation for its ruling on the record. The trial court explained that "it cannot be said that it is arbitrary and capricious for the school to view the conduct here, based on the information that it had, as seriously damaging to the reputation of the school or threatening the physical, moral, or intellectual welfare of the school community; and, therefore, subject to summary dismissal under the express terms of the handbook." The trial court explained that, "beyond the argument of a breach, [the Uzubells] offer[] no evidence of arbitrary and capricious."

¶ 36    The trial court further explained that "the question is not whether [Mount Carmel] was correct when it concluded that Bradley and Alexander were involved. The question is whether the school was arbitrary and capricious in reaching that conclusion." Thus, the trial court concluded, "making no finding that what the school did was correct, making no finding that the Court would or would not have acted differently, making no finding that the school could or could not have acted differently -- what the Court finds strictly is that the school did not act arbitrarily and capriciously as the courts defines [] that type of conduct." The trial judge stated that he could not in good conscience "come to the conclusion that I can submit this case to a jury,

because I do not believe there's evidence that would allow a jury to conclude that the conduct was arbitrary and capricious."

¶ 37    Following the judgment being entered in Mount Carmel's favor, the Uzubells filed this appeal.

¶ 38                              ANALYSIS

¶ 39    The Uzubells argue that the trial court erred when it granted summary judgment in Mount Carmel's favor. Summary judgment is appropriate when the pleadings, depositions, admissions, and affidavits, viewed in a light most favorable to the nonmovant, fail to establish a genuine issue of material fact, thereby entitling the moving party to judgment as a matter of law. 735 ILCS 5/2–1005 (West 2018); *Fox v. Seiden*, 2016 IL App (1st) 141984, ¶ 12. When, as here, the parties file cross-motions for summary judgment, they agree that no genuine issues of material fact exist, and they invite the court to decide the case as a matter of law based on the record. *Casey's Marketing Co. v. Hamer*, 2016 IL App (1st) 143485, ¶ 11. When cross-motions for summary judgment are filed as to the same issues and the trial court grants one party's motion and denies the other party's motion, the resulting order is final and appealable because it entirely disposes of the litigation. *Arangold Corp. v. Zehnder*, 187 Ill. 2d 341, 358 (1999). We review a trial court's ruling on a motion for summary judgment *de novo. Illinois Tool Works Inc. v. Travelers Casualty & Surety Co.,* 2015 IL App (1st) 132350, ¶ 8.

¶ 40    Both parties acknowledge that Illinois courts have recognized a cause of action for breach of an implied contract by students against a private school. *Bosch v. Northshore University Health System*, 2019 IL App (1st) 190070, ¶ 29. Our courts have held that students have a cause of action sounding in breach of an implied contract against a private school when the school makes an arbitrary and capricious adverse academic decision in the school's treatment of the

student, including dismissal *Seitz-Partridge v. Loyola University Chicago*, 409 Ill. App. 3d 76, 82 (2007); *Raethz v. Aurora University*, 346 Ill. App. 3d 728, 732 (2004). An academic decision is arbitrary and capricious when it lacks any discernable rational basis and is such a substantial departure from accepted norms as to demonstrate that the person responsible did not actually exercise professional judgment. *Bosch*, 2019 IL App (1st) 190070, ¶ 34. A student's burden of establishing arbitrary or capricious conduct by a school is a heavy one. *Raethz*, 346 Ill. App. 3d at 732. The plaintiff must show that the dismissal was "without any discernible rational basis." *i.e.*, that the dismissal is "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id*. (quoting *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985)).

¶ 41　　The Uzubells acknowledge they are required to show Mount Carmel made an arbitrary and capricious decision in order for them to demonstrate a breach of the implied contract.

¶ 42　　The Uzubells argue that "[t]he evidence here established that Principal Tabernacki acted arbitrarily, capriciously and in bad faith" when he advised the Uzubells that their only two options were to withdraw from the school or be expelled. The Uzubells contend that the evidence established that neither Bradley nor Alexander created the White Student Union or Hispanic Union Instagram accounts and did not post any of the messages at issue in this case. Rather, the Uzubells argue, Krembs was the person who created both accounts and posted the messages at issue in this case.

¶ 43　　In addition to arguing that they were not responsible for the offending Instagram posts, the Uzubells argue that Principal Tabernacki was not thorough in his investigation as he only

reviewed the email from Principal Begley of Lake Central High School and spoke only to Krembs before speaking to the Uzubells and notifying them of the disciplinary decision.

¶ 44    Mount Carmel argues the only issue before the court is whether Principal Tabernacki's decision to offer the Uzubells the choice of withdrawing or expulsion was arbitrary and capricious based on the facts he was aware of at the time he made the offer.  It is undisputed that Principal Tabernacki received an email from Principal Begley stating that a police investigation revealed Bradley and Alexander Uzubell were responsible for the Instagram accounts. Principal Begley further informed Principal Tabernacki that he and two police officers met with the Uzubell family, and the investigators were able to get the Uzubells to log in and take down both accounts, confirming that the Uzubells had control of the accounts. Principal Tabernacki reviewed the posts from the Instagram accounts and saw the offensive content for himself.

¶ 45    Principal Tabernacki testified that he confirmed the information in Principal Begley's email in a phone call with Principal Begley. Principal Tabernacki testified that his next step in the investigation was to speak to Cpl. Patrick. According to Principal Tabernacki, in their conversation, Cpl. Patrick confirmed the details in Principal Begley's email, and Cpl. Patrick told Principal Tabernacki that "both boys had admitted to it" and "both boys were visibly upset." Cpl. Patrick confirmed to Principal Tabernacki in that phone call that the Uzubell brothers admitted to making the Instagram posts in question, and Cpl. Patrick informed Principal Tabernacki that the police officers were able to track the IP address from the Instagram postings which led them to the Uzubells' home. Cpl. Patrick conducted a week-long investigation in which he interviewed approximately 30 students, dozens of parents, school administrators, and other police officers to identify the individual or individuals behind the Instagram account. As a result of the investigation, Cpl. Patrick learned that Bradley and Alexander Uzubell were

responsible for creating and posting on the Instagram accounts. Principal Tabernacki had no reason to believe any other students were involved because Principal Begley and Cpl. Patrick's investigation concluded that the Uzubells were the sole responsible parties.

¶ 46 Principal Tabernacki testified that he then had a phone conversation with the Uzubells. Susan Uzubell asked in that conversation if Alexander could continue at the school if Bradley took full responsibility. Bradley Uzubell took responsibility for his involvement in the incident. In consideration of this information, Principal Tabernacki gave the Uzubells the option to withdraw their enrollment with the school, and the Uzubells accepted.

¶ 47 Mount Carmel contends, as Principal Tabernacki testified in his deposition, that it informed the Uzubell parents that their sons could withdraw from the school or go through the discipline board hearing process, which could result in discipline up to expulsion. The Uzubells claim that Principal Tabernacki never brought up the disciplinary process and, when Joseph Uzubell brought it up, Principal Tabernacki said the review board would be a waste of time and his sons would be found guilty. Susan Uzubell stated that once Principal Tabernacki confirmed that the family had spoken to the investigators, he immediately indicated that the boys "were released from the school and they had just two options, either withdraw immediately from the school or they would be expelled." The Uzubells additionally dispute the factual foundation Mount Carmel has laid for Principal Tabernacki's exercise of professional judgment. Principal Tabernacki testified that he relied not only on the email from Principal Begley, but also on a phone conversation with Principal Begley and a phone conversation with Cpl. Patrick. However, both Principal Begley and Cpl. Patrick testified that they did not speak to Principal Tabernacki or at least did not remember speaking to Principal Tabernacki on the date of March 11, 2021.

17

¶ 48    This question of how the expulsion issue was raised and whether Principal Tabernacki spoke with Principal Begley and Cpl. Patrick before calling the Uzubell family on March 11th is disputed by the parties, but the disputed questions are not "material" as they are not outcome determinative. *Thai v. Triumvera 600 Naples Ct. Condo. Ass'n*, 2020 IL App (1st) 192408, ¶ 38 ("Material facts are facts that might affect the outcome of the case under the applicable substantive law.").

¶ 49    Even if Principal Tabernacki's disciplinary decision was based only on the police investigation as communicated to him by Principal Begley, we find the Uzubells have not shown that Principal Tabernacki acted in an arbitrary and capricious manner. Principal Tabernacki had reliable information—the communication from another school principal—that after a police investigation the Uzubells were found to be responsible for the Instagram accounts and the accompanying posts, and he received no contrary information to raise any doubt about the Uzubells' responsibility. Principal Tabernacki was informed about the extensive police investigation. He relied on an email from a fellow principal that the Uzubells authored the pages. There is no evidence in the record that the Uzubells disputed their involvement in the Instagram accounts during their conversation with Principal Tabernacki.

¶ 50    The record shows that Principal Tabernacki employed professional judgment in acting on the information he received in Principal Begley's email, confirming the Uzubells' involvement, confronting them with the information, and offering them an option to withdraw from the school to keep their academic records clean. Principal Tabernacki had a rational basis for his disciplinary decision as it was grounded in a legitimate concern for the safety and welfare of the school. The record also shows that Principal Tabernacki's conduct and decision-making was

consistent with how he had dealt with similar social media misconduct in the past from other students who had likewise opted to withdraw.

¶ 51    As we concluded in *Raethz*, "[w]hat would make [Mount Carmel] liable for breach of contract *** is not that [Mount Carmel] exercised its academic judgment unwisely, by allegedly failing to properly comply with the [Handbook], but that it did not exercise its academic judgment at all, instead acting arbitrarily or in bad faith in its treatment of [the Uzubells]." *Id.* at 733. The Uzubells offered no evidence that could be found to show that Mount Carmel acted arbitrarily or capriciously in this case.

¶ 52    As the circuit court correctly found, the question presented by the cross-motions is whether Principal Tabernacki acted arbitrarily or capriciously in his treatment of Bradley and Alexander at the time he gave them the option to withdraw or face expulsion. Principal Begley's responses at the deposition, which were at odds with the statements he made in the email to Principal Tabernacki, do not speak to Principal Tabernacki's knowledge at the time he was in possession of the email and exercised his professional judgment regarding the Uzubells' discipline. At the time Principal Tabernacki gave Bradley and Alexander the option to withdraw or face expulsion, the investigation led by Cpl. Patrick and reported to him by Principal Begley supported the conclusion that Bradley and Alexander were solely responsible for creating and posting on the Instagram accounts. The evidence supports the conclusion that Principal Tabernacki's disciplinary decision was made in view of legitimate academic concerns and concerns about the welfare of the school and its students. See *Frederick v. Northwestern University Dental School*, 247 Ill. App. 3d 464, 472 (1993) (if a student cannot produce evidence to show that a school's dismissal decision is not based on legitimate academic or professional concerns, he has not raised a question of fact that the dismissal was arbitrary and capricious).

19

¶ 53    The Uzubells argue that Principal Tabernacki failed to truly attempt to ascertain who was behind the Instagram posts at issue and his failure to conduct a proper investigation was arbitrary and capricious. They claim that Principal Tabernacki never tried to speak with Alexander and Bradley to hear both sides. The Uzubells claim that if Principal Tabernacki conducted a proper investigation, he would have uncovered that Krembs was responsible and not the Uzubells.

¶ 54    The record, however, shows that both Alexander and Bradley were present for the phone call Principal Tabernacki had with the Uzubell parents. That conversation lasted between 45 minutes and an hour. At least one of the boys spoke to Principal Tabernacki during that phone call. Principal Tabernacki also had reliable information from a fellow principal, based on a thorough law enforcement investigation, that the Uzubells had authored the Instagram pages. There is no evidence in the record that the Uzubells ever denied involvement in the lengthy phone call with Principal Tabernacki.

¶ 55    Moreover, while not dispositive to our decision, the Uzubells admitted their involvement either tacitly or directly, in several communications with the school. In their attempts to have Alexander reinstated, Mrs. Uzubell, Bradley, and Alexander himself argued that Alexander took the blame for the accounts in front of Cpl. Patrick to protect his younger brother Bradley. This statement is an admission Alexander took the blame for the accounts in front of the police officer, contrary to the Uzubells' later claims that Alexander never admitted responsibility.

¶ 56    The Uzubells argue that Mount Carmel "clearly breached the School Policies section of the Handbook" because neither Bradley nor Alexander engaged in any of the conduct listed in the seven categories of offenses that would subject a student to expulsion without a disciplinary hearing. They argue that Mount Carmel "also breached the agreement by failing to afford Alexander and Bradley a hearing before the Discipline Review Board." The Uzubells argue that

there was nothing in the Handbook preventing them from receiving the disciplinary hearing they requested even after they withdrew from the school, and "the handbook clearly allowed the Uzubells to request a hearing."

¶ 57    The Handbook specifically provides for summary expulsion if a student incites mob action. Mount Carmel produced evidence that the Instagram posts could be found to have resulted in the incitement of mob action or constitute threats to commit violence. The White Student Union Account and the Hispanic Union account were purposefully set up to make it appear that there was a conflict between the two groups and create division and conflict. The bio for the Hispanic Union Instagram account stated that it was "here to bring the white student union down." On the Instagram account, the Uzubells summoned the general public to the parking lot of the local Walmart at a specific date and time to discuss the divisive issues they were posting about. They claimed that they would scream slurs so people could recognize who constituted the White Student Union, and they antagonized the people posting in opposition to them by stating that those people would not even show up or would not do anything at the meetup because those people are all talk.

¶ 58    Upon discovering that the Uzubells were responsible, Principal Begley stated that he would not be revealing the Uzubells' identities to anyone other than the Mount Carmel administration because the posts had struck a nerve in the community and someone might try to seek retribution against the boys. Cpl. Patrick testified that, in his experience, situations like this one that begin on social media are likely to lead to actual violence unless they are promptly addressed.

¶ 59    Principal Tabernacki explained his conclusion that mob action was being incited by the Instagram posts "because they were promoting and planning an event at a local Walmart in

which they would target specific groups of people and encouraging them to appear and explicitly stating behavior in order to lead to a disruption at that particular Walmart." It was not arbitrary and capricious for Principal Tabernacki to conclude that the Uzubells, through the White Student Union and Hispanic Union Instagram accounts, desired to incite some form of mob action.

¶ 60    Moreover, the Handbook does not state that a student may only be summarily expelled if he engages in one of the seven enumerated types of conduct listed therein. The Handbook states that "Mount Carmel High School will dismiss a student summarily who has damaged seriously the reputation of the school or whose conduct threatens the physical, moral or intellectual welfare of the school community." The Instagram posts caused significant disruption at two area high schools, consumed school and police department resources, and resulted in student and parent complaints and distress among the student body and in the community.

¶ 61    The Handbook also includes a section on "Other Prohibited Behaviors" which explains that, "[w]hen necessary[,] appropriate actions will be taken for any behavior that is unsafe, disrespectful, or inconsistent with school values." The Mount Carmel administration concluded that the Uzubells' conduct raised safety concerns, was offensive, and was wholly inconsistent with the school's values. The administration, thus, took the disciplinary action it believed to be necessary. Based on the evidence at hand, the Uzubells cannot show that Mount Carmel acted in an arbitrary or capricious manner by concluding that the Uzubells' conduct met the criteria for summary dismissal. The Uzubells likewise cannot show that Mount Carmel acted in an arbitrary or capricious manner if it were to have concluded the appropriate action was expulsion for behavior that was disrespectful and severely inconsistent with school values.

¶ 62    The Uzubells can point to nothing in the Handbook to demonstrate that they were entitled to a hearing before the Discipline Review Board. The Handbook gives significant discretion to

the principal or dean of students concerning whether to convene the board. Principal Tabernacki and Dean of Students Dan O'Connor met about the Uzubells' request and reached a consensus that the students' status would not change after they opted to withdraw. The Uzubells did not request a hearing until after they withdrew from the school. As stated above, even if Mount Carmel deviated from the Handbook in some respect, "[w]hat would make [the school] liable for breach of contract *** is not that [Mount Carmel] exercised its academic judgment unwisely, by allegedly failing to properly comply with the [Handbook], but that it did not exercise its academic judgment at all, instead acting arbitrarily or in bad faith in its treatment of [the Uzubells]." *Id*. at 733. Here, Principal Tabernacki and Dean of Students Dan O'Connor met and conferred, and they confirmed the exercise of judgment that the Uzubells were not entitled to a hearing would stand.

¶ 63    The Uzubells also argue that it was arbitrary and capricious that Krembs received a discipline review board hearing while they did not. Krembs, however, did not elect to withdraw from the school. Because the discipline review board hearings are privileged, there is no record of what transpired at Krembs' hearing. The only evidence in the record that Mount Carmel had about Krembs putative involvement was that he approached Principal Tabernacki and admitted knowing about the Instagram accounts. Despite the Uzubells' various statements that Krembs is the one responsible for the Instagram accounts and the posts, there has never been any finding or conclusive proof that Krembs is the responsible party, to the exclusion of the Uzubells. The Uzubells have not produced evidence that Mount Carmel acted in an arbitrary or capricious manner towards them and, accordingly, we affirm the trial court's order granting summary judgment in Mount Carmel's favor.

¶ 64                                        CONCLUSION

23

¶ 65    Based on the foregoing, we affirm the circuit court's order granting summary judgment in defendant's favor.

¶ 66    Affirmed.